In re Alexis M. YERMAKOV, dba Westerly Stud Farms, Debtor.

Edward R. FITZSIMMONS and Richard Weldon, Appellants,

v.

Alexis M. YERMAKOV, dba Westerly Stud Farms; and Lawrence A. Diamant, Trustee, Appellees.

Bankruptcy No. CC–81–1036–GKV.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued July 15, 1981.

Decided April 1, 1982.

Merle C. Meyers, Goldberg, Stinnett & MacDonald, San Francisco, Cal., for appellants.

Rauer L. Meyer, Bushkin, Kopelson, Gaims & Gaines, Los Angeles, Cal., for appellees.

OPINION

Before GEORGE, KATZ and VOLINN, Bankruptcy Judges.

VOLINN, Bankruptcy Judge:

Appellant, Edward R. Fitzsimmons, is attorney for the debtor-appellee, Alexis M. Yermakov. The subject matter of the appeal is appellant's claim for attorney's fees based on a written contingent fee agreement executed by the parties on September 26, 1978, more than one year prior to this Chapter 11 case, which was filed on February 4, 1980. The agreement provided that appellant's compensation was to be contingent on the improvement or "enhancement" of debtor's circumstances relating to certain property over which existed at the time of its execution. The contingent fee was set at 35% of the enhancement, to be secured by a lien thereon.

At the hearing on his claim, appellant contended that as a result of his efforts,

particularly the litigation instituted by him and ultimately settled, debtor's position was enhanced to a point where all his creditors were paid in full, and further, the debtor had use of property, and obtained title to part thereof, all of which had a total value of some $4,500,000 to which the 35% contingent fee should attach. The court allowed appellant, as compensation, the sum of $100,000, whereupon this appeal ensued.

## INTRODUCTORY

The schedules prepared and filed by the debtor provide some measure of the scale of his holdings. Schedule B–1 (E.R. p. 261 *et seq.*) describes the real property, valued at $25,000,000, as:

"Westerly Stud Farm—approximately 4,000 acre facility in the business of raising, breeding, training, and selling of thoroughbred horses located at 5699 Happy Canyon Road, Santa Ynez, California..."

The total of the debtor's B–2 personal property schedules showed some $10,742,-000, the major components thereof being the machinery, fixtures, equipment and supplies of the stud farm, some $7,000,000 in horse inventory, and some $3,000,000 in cash deposits with various banking institutions. A substantial portion of the foregoing deposits, approximately $2,000,000, were being held pursuant to order of the Santa Barbara Superior Court.

Secured claims totalled some $5,700,000. Claims of general unsecured creditors amounted to some $25,000. The schedules thus show assets in a total of some $35,700,-000 as against debts totalling some $5,730,-000.

These figures raise the question as to why the debtor had recourse to Bankruptcy Court. Some indication as to the reason is given by the answer to question 12(a) of the statement of affairs which states:

"Case entitled *Alexis and Katherine Yermakov vs. Johnstons, et al*, filed in the Santa Barbara Superior Court, Case No. SM25850. The matter is an action to set aside the sale on foreclosure of Westerly Stud Farms; for fraud and failure to comply with statutory foreclosure, and for damages. The complaint prays for a total of $42,000,000."

It may thus be inferred that the debtor had lost his interest in Westerly Stud Farms by foreclosure sale and had instituted a state court action to set aside the sale. How did this come to pass?

## THE PURCHASE OF WESTERLY

Westerly Stud Farms, one of the outstanding stud farms in the United States, consisting of some 3,700 acres of grassland in the Santa Ynez Valley near Solvang, California, was offered for sale in 1974 by the Bank of America, which was administering the estate of Fletcher Jones, owner of Westerly. The debtor purchased the farm for some $5,760,000, executing a promissory note and deed of trust for the balance of the purchase price, $3,000,000, which was due on or about February 15, 1979, five years from date of purchase. During this period of time, interest payments of $240,000 a year, payable quarterly, were required.

About one year later, in February, 1975, the debtor purchased several hundred thoroughbred horses from the Johnston family for some $2,100,000 with an option to purchase more race horses subsequently. A promissory note of some $1.5 million, with a second deed of trust to secure same, was executed by the debtor for the balance of the purchase price of the horses. For reasons to be later discussed, it should be noted that while the agreement for the purchase of the horses provided that the second deed of trust would attach to all of Westerly, the property description in the second deed of trust omitted a 210 acre parcel on which was located the debtor's residence, a complete breeding facility, and various other improvements.

In July, 1975, the debtor exercised the option to purchase race horses, providing the Johnstons with a promissory note in the sum of some $1,200,000 for the purchase thereof. The latter promissory note was to be secured by the already executed second deed of trust.

## ONSET OF FINANCIAL PROBLEMS

The debtor was able to make the first payment of $1,000,000 in April, 1976, but in 1977 was unable to make the second annual payment nor the interest payments. The Johnston family, in November, 1977, gave notice of default and election to sell under the second deed of trust. When the debtor and his wife failed to meet payments due in April, 1978, the holder of the first deed of trust also gave notice of default and election to sell under deed of trust.

The debtor and his wife negotiated with the holders of the first deed for further time, which was granted, one reason having been the omission from the second deed of trust of the 210 acre parcel, for which a corrected deed of trust was executed including same. Ultimately, on September 12, 1978, the foreclosure sale on the second deed of trust, as corrected, was held. There were 19 bids. The successful bid was made by a group of individuals ("The O'Brien Group") for $4,500,000 subject to the first deed of trust which secured the $3,000,000 note. The two notes held by the Johnstons were paid. The debtor and his wife received the remaining balance of some $1,930,000.

The debtor and his wife negotiated with the O'Brien Group for time to remain at Westerly. They were granted until November 4, 1978, provided that the debtor relinquish certain personal property at Westerly worth approximately $300,000. At this point the debtor and his wife had lost Westerly, and as a price for having approximately six weeks to remove or liquidate 150 race horses worth millions, were forced to relinquish personal property of considerable value.

## THE CONTINGENT FEE AGREEMENT

The debtors, through their attorney, Paul Halme, contacted appellants, Edward Fitzsimmons and Richard Wheldon. As a result, appellants and the Yermakovs entered into a contingent fee agreement under the date of September 26 (E.R. 112). The agreement is in the form of a letter from appellant to Mr. and Mrs. Yermakov, outlining the difficult circumstances which existed at the time.[1]

## LITIGATION IN STATE COURT

Appellant concluded that litigation should be instituted to set aside the foreclosure sale on the second deed of trust, alleging defects in the proceedings because the original failure to include the 210 acre parcel, as well as fraud on the part of counsel for the Johnstons and the purchasers (The O'Brien Group) in the conduct of the foreclosure sale. The complaint thereon was filed on September 28, 1978, in the California State Court. A cross-complaint was filed seeking substantial damages plus $3,000 per day as long as the Yermakovs remained at Westerly. The O'Brien Group also filed an unlawful detainer action which, on motion of appellant, was consolidated with the com-

---

1. The letter, in part, states:
   "Negotiations conducted by your attorney, Paul Halme, and Katherine, assisted by staff members and your accountant, have led to the purchasers offering that you can stay over at Westerly until November 4, 1978, but that any property on Westerly thereafter will be deemed abandoned by you, and title will pass to the purchaser of the second deed of trust.
   A list of equipment, which is partial, has been the subject of an offer to purchase for $300,000, and that agreement—prepared by the purchasers of the second deed of trust— would require you to confirm title in them. You have declined this offer and have elected to proceed to protect your legal rights by litigation. Paul Halme, who has served you well, is witness to many of the important proceedings and hence cannot handle this litigation for you.
   We have offered to serve you on a fee basis, but desiring not to pay any ongoing attorneys' fees, save and except the retainer described below, after consultation with Paul Halme, you have elected on your own judgment—with no representations from us—to proceed on a contingent fee agreement.
   In part, this clearly reflects your understanding of the extreme difficulty of this matter at this time.
   You, and each of you, agree that we shall have, and are hereby granted, a thirty-five percent (35%) contingent fee of any enhancement on your present position, whether due from trial, settlement or sale. Said fee is subject to a lien which you, and each of you, hereby grant to us and which is irrevocable."

plaint to set aside the foreclosure. Appellant successfully resisted a motion for summary judgment, whereupon extensive discovery ensued. In September, 1979, the O'Brien Group engaged in a flanking maneuver, purchasing the $3,000,000 first deed of trust which was substantially in default. Appellant moved to restrain foreclosure thereof since it would have rendered moot, proceedings directed to vacating foreclosure of the second deed of trust. Initial success in obtaining a temporary injunction was vitiated by dissolution of this injunction on January 8, 1980. Further effort at the appellate level also failed.

At this point, the debtor was faced with loss of all further possibility for maintaining the litigation. In a last effort to keep the set-aside litigation alive, on advice of counsel, he filed, on February 4, 1980, a Chapter 11 bankruptcy petition.

## LITIGATION IN BANKRUPTCY COURT

On May 12, 1980, the Bankruptcy Court entered an order denying debtor's motion to remand to the Santa Barbara Superior Court the state court litigation which had been previously removed to the Bankruptcy Court. In the course of entering this order, the court required the turnover to the trustee in bankruptcy in the instant proceedings, various sums of cash or negotiable instruments which had been tied up in the Superior Court litigation, to-wit, the principal and interest on certificates of deposit totalling approximately $2,000,000.

The bankruptcy trustee formally entered the litigation as a party defendant on the eve of trial, on or about June 10, 1980 (E.R.377).

The matter went to trial, appellant having presented substantial testimony as a witness. During trial, on June 12, 1980, negotiations resulted in the settlement discussed below.

The trustee, (E.R.379) described the settlement as follows:

"Your trustee is informed and believes that by virtue of the settlement, the debtor will have real property with a value in excess of $2,000,000, under one settlement alternative, or $12–40,000,000 under another settlement alternative, with which to protect creditors and to pay in full secured and unsecured creditor debt totalling less than $1,000,000. In addition, thereto there exists personal property consisting of farm equipment and equipment relating to the horse training and breeding operation, which the debtor believes is worth in excess of an additional $.5 million. Added to the value of the assets aforementioned, are approximately 150 thoroughbred horses, the value of which the debtor has estimated to be at $7,000,000."

## DISMISSAL OF CHAPTER 11 CASE

On or about August 6, 1980, Mr. Yermakov, the debtor, wrote to his Chapter 11 attorney, Richard M. Moneymaker (E.R. 415) as follows:

"Dear Mr. Moneymaker:

As we discussed on the telephone August 6, 1980 and earlier, I would like you to take steps to immediately dismiss the Chapter 11 bankruptcy proceeding. I am willing to pay all outstanding obligations listed by me in the bankruptcy proceedings and to pay all costs of administration as per ordered by the court.

Please bring on the necessary proceedings as soon as possible. Thank you.
                    Sincerely yours,"

The trustee, on September 10, 1980, replied and objected to the application for dismissal stating that he would not oppose eventual dismissal of the proceedings but that such dismissal would be premature pending completion of certain formalities such as the filing of tax returns, resolution of certain sales tax questions "and the determination of the amounts owed creditors and administrative expenses." It also appears that appellant objected to dismissal of the proceedings until his fee was determined.

On June 12, 1980, the court approved final settlement of the complaint to vacate the foreclosure sale. The court's judgment of approval, entered on July 11, 1980 (E.R. 1) is appended and includes a transcript of this aspect of the proceeding, numbering 57 pages. Appellant appeared there repre-

senting both Alexis M. and Katherine K. Yermakov. The final settlement between the parties was worked out in open court.[2]

The transcript of the settlement meeting, among other things, demonstrates clearly that all concerned, the trustee, his lawyer, counsel for the various parties, and the court were cognizant of the fact that the Yermakovs themselves were reluctant to settle. The trial court observed that this reluctance or "intransigentism" was a great problem in resolving the case without a full trial and the area in which the trustee made a significant contribution. To put it otherwise, the court was impressed with the ability of the trustee and his counsel in persuading the Yermakovs to settle.[3] As indicated, Fitzsimmons, as counsel for the Yermakovs, advised them, and in their presence and with their consent, stipulated for the settlement which resulted in the court's judgment disposing of the lawsuit.

## ENHANCEMENT

■ The court below indicated that the term or concept of enhancement was indefinite and that, in any event, there was no demonstrable enhancement of the debtor's position brought about by appellant. This finding or conclusion is not warranted by language[4] or by the record which supports a contrary result. The debtor's position, on the date of the contingent fee agreement, September 26, 1978, provided a clear baseline. He had lost record title to all of Westerly Stud Farms and was to be evicted therefrom by November 4, 1978, with a consequent loss, as a result of remaining

there until that time of personal property valued at some $300,000. As a result of the eviction, he would have been deprived of the use of the premises for a stud farm which the court, in finding the reasonable value of administrative rent, determined to be $43,000 a month, plus $60,000 a quarter, for a total of $58,000 per month (the counterclaim contended that the reasonable value of the farm was $3,000 per day of $90,000 per month).

Thus, as a result of the litigation instituted and prosecuted by appellant and settlement thereof, the debtor, instead of losing Westerly in November, 1978, obtained clear title to a 210 acre parcel thereof, on which was located improvements of considerable value, including a substantial family home and breeding facilities which the debtor had valued at some $3,000,000. In addition, the debtor had the use of Westerly for a period of 23 months which, based on the court's finding as to administrative rent, should be in the value of $1,250,000. Appellants therefore contend that they should be awarded record title to 35% of the 210 acre parcel, plus the sum of $437,500. They have pointed to other items of enhancement but have focused on these two items. In the light of this record, the court's finding of no enhancement was clearly erroneous.

## VALIDITY OF THE CONTINGENT FEE AGREEMENT

### I.

■ There seemed to be some question in the court below as to the validity, *per se*, of

---

**2.** Mr. Fitzsimmons actively participated in these final negotiations on behalf of and in the presence of the Yermakovs. At p. 60 of the transcript (E.R. 52) Mr. and Mrs. Yermakov were directly asked if they understood the discussions and if they had any questions. The following colloquy took place:

"Mr. Yermakov: We fully understand and we have no further questions.
Mrs. Yermakov: Yes. We do, we do.
Mr. Rothman: Mr. Fitzsimmons?
Mr. Fitzsimmons: May I just ask my clients: Are all of the terms and conditions of this matter which have been presented acceptable to you each and will you be bound by it?
Mr. Yermakov: Yes. We understand it and will be bound by it.

Mr. Fitzsimmons: Are you also bound by it?
Mrs. Yermakov: Yes.
Mr. Fitzsimmons: Thank you. If my clients are bound, I am bound by it."

**3.** As of September 30, 1980, counsel had expended 474 hours for which a fee of $61,048 was requested. There was an estimate as to expenditure of further time of 30–40 hours justifying an additional fee of $5,000, for a total of $66,048, or approximately $120.00 per hour which was allowed by the court.

**4.** Definition 3a of *Webster's 3rd New International Dictionary* defines "enhance" as follows:
"To increase the worth or value of (an estate *enhanced* by careful management)..."

the contingent fee agreement. Such agreements, while looked at askance in other systems of law, have become acceptable, and in various areas, the conventional basis for agreements between clients and attorneys relative to compensation. It may be noted that contingent fee agreements are sanctioned by the Bankruptcy Code, 11 U.S.C. § 328. The court below, as justification for questioning the contingent fee, pointed to Ethical Consideration 2–20 of the Code of Professional Responsibility which authorizes contingent fees, subject to the concern the clients not be overreached.

The facts do not establish or support an unconscionable overreaching of a client by an attorney. The contingent fee agreement and the record in this case make it clear that, while the Yermakovs had substantial property and close to $2,000,000 in cash as a result of the deed of trust sale, they were aware that further litigation would be long term, substantial, and had concluded that the resulting attorneys' fees could be so great that further risk was not warranted. Consequently, they contracted to shift the financial burden of litigation to appellant. Fitzsimmons thereafter expended substantial amounts of time and professional ability, as it turned out, approximately 2,000 hours,[5] in protracted, complex litigation, his compensation to be derived only from an enhancement over the Yermakov's position measured against what it was on September 26, 1978.

In this context, there was no overreaching such as is implicit in the cited provision of the Code of Professional Responsibility. That the parties knew of the rough road ahead is amply confirmed by the record. The trustee, his counsel, and the court recognized this and described explicitly the complexity and risk attending the litigation. Considering the circumstances existing at the time, the agreement was reasonable. The court's finding as to unconscionability was therefore clearly erroneous.

The court, however, considered the overriding difficulty to have been the settlement:

"Until the settlement was announced and approved, it appeared to me that the debtor and his wife were intransigent. They wanted the farm for no consideration.

The intransigentism of the debtor and his wife possibly may be explained by their unrealistic expectations of the outcome of their case. Another factor may have been the fee arrangement with their attorneys." (E.R. 250)

On this basis, the court concluded that because the trustee and his counsel had prevailed on Yermakov to settle, appellant's efforts were not sufficient to warrant compensation on a similar scale, let alone commensurate with the contract. However, Yermakov's extreme reluctance to settle is hardly a reason for devaluation of appellant's efforts in formulating and prosecuting the lawsuit without which there would have been nothing to settle.

## II.

There is an aspect to this case which does not usually attend bankruptcy fee litigation. This aspect bears on the lack of creditor involvement. The policy of the law, particularly in bankruptcy, is that fee applications by officers of an estate be reviewed by a court so as to inhibit or prevent excessive charges. Here, there are no creditors, nor, in effect, is there an estate for anyone other than the debtor who litigates, not as trustee for the benefit of creditors, but as a private party for no one's benefit but his own. The court has jurisdiction over the dispute because of the fortuitous circumstance that there remains for resolution, after satisfaction of all bankruptcy-related claims, a contest between the debtor and his counsel as to the nature and extent of their fee agreement.[6] The issues, therefore,

---

5. Appellant kept no contemporaneous time record because of the contingent fee contract. The record as to time was estimated and fur-

nished to the court in connection with the fee application.

6. Whether the court has the power to review this agreement (executed more than one year

should be considered in the light of the debtor being the real party in interest, *In re Cummins*, 15 B.R. 893, 8 B.C.D. 537 (9th Cir. Bkrtcy.App.1981).

Viewing this case from this perspective, it would be appropriate to examine what California courts would hold under similar circumstances. *Setzer v. Robinson*, 57 Cal.2d 213, 18 Cal.Rptr. 524, 368 P.2d 124 (1962) held that the reasonableness of contingent fee agreements is to be judged not by hindsight, but by the situation as it was when the agreement was entered into. It also stated that contingent fee contracts for one-third of the recovery have been frequently upheld.

In upholding a $1,000,000 contingent fee agreement for services, which, because of a settlement, consisted only of filing a petition for *certiorari* with the Supreme Court, it was stated in *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir. 1979), after a review of California law:

> "Whether a contract is fair or works an unconscionable hardship is determined with reference to the time when the contract was made and cannot be resolved by hindsight."

### III.

■ The provision for a lien is valid and enforceable. *In re Pacific Far East Lines* 654 F.2d 664 (9th Cir. 1981). That case, citing and discussing California decisions, is authority for according to an attorney a lien on the proceeds of settlement, during bankruptcy, of a case instituted prior to bankruptcy where the contingent fee agreement provided for the lien. The lien takes effect from the date it was created. Upon the fund's production, the lien attaches to the specific asset. Here, virtually all of the time expended by appellant was prior to bankruptcy. This factor, coupled with the considerations previously stated, makes it unnecessary to distinguish between pre- and post-bankruptcy services, a concern in *Pacific*.

prior to bankruptcy) is subject to question in view of 11 U.S.C. § 329(a) providing for review of fees or fee agreements concluded within one

## CONCLUSION

We conclude that, under the circumstances, appellants and appellees entered into a fair contract which should be enforced. We therefore REVERSE and REMAND with directions that counsel be awarded 35% of the reasonable value of the rental property for the 23 month period of occupancy and use of the stud farm and 35% of the value of the farm itself, together with a lien against any available assets including the stud farm to secure said 35% contingent fee which lien shall be superior to any lien or mortgage placed on any or all property acquired as a result of the settlement of the litigation instituted by appellant.

year prior to bankruptcy. However, in view of the disposition of this matter, discussion of § 329(a) is unnecessary.