**BROBECK, PHLEGER & HARRISON, a partnership, Plaintiff-Appellee,**

**v.**

**The TELEX CORPORATION, a corporation, and Telex Computer Products, Inc., a corporation, Defendants-Appellants.**

No. 77–1419.

United States Court of Appeals,
Ninth Circuit.

July 5, 1979.

Rehearing Denied Sept. 6, 1979.

Moses Lasky (argued), Brobeck, Phleger & Harrison, San Francisco, Cal., for plaintiff-appellee.

Herman F. Selvin (argued), Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., for defendants-appellants.

Before MOORE *, SNEED and TANG, Circuit Judges.

PER CURIAM:

This is a diversity action in which the plaintiff, the San Francisco law firm of Brobeck, Phleger & Harrison ("Brobeck"), sued the Telex Corporation and Telex Computer Products, Inc. ("Telex") to recover $1,000,000 in attorney's fees. Telex had engaged Brobeck on a contingency fee basis to prepare a petition for certiorari after the Tenth Circuit reversed a $259.5 million judgment in Telex's favor against International Business Machines Corporation ("IBM") and affirmed an $18.5 million counterclaim judgment for IBM against Telex. Brobeck prepared and filed the petition, and after Telex entered a "wash settlement" with IBM in which both parties released their claims against the other, Brobeck sent Telex a bill for $1,000,000, that it claimed Telex owed it under their written contingency fee agreement. When Telex refused to pay, Brobeck brought this action. Both parties filed motions for summary judgment. The district court granted Brobeck's motion, awarding Brobeck $1,000,000 plus interest. Telex now appeals.

Telex was the plaintiff in antitrust litigation against IBM in the United States District Court for the Northern District of Oklahoma. On November 9, 1973 the District Court found that IBM had violated § 2 of the Sherman Act, 15 U.S.C. § 2 (Supp. IV 1974), and entered judgment for Telex in the amount of $259.5 million, plus costs and attorney's fees of $1.2 million. The court

---

* Honorable Leonard P. Moore, Senior Circuit Judge for the Second Circuit, sitting by designation.

also entered judgment in the sum of $21.9 million for IBM on its counterclaims against Telex for misappropriation of trade secrets and copyright infringement.

On appeal, the Tenth Circuit reversed the entire judgment that Telex had won in the district court. *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894 (10th Cir. 1975). It also reduced the judgment against Telex on IBM's counterclaim to $18.5 million and affirmed the district court's judgment as modified.

Having had reversed one of the largest antitrust judgments in history, Telex officials decided to press the Tenth Circuit's decision to the United States Supreme Court. To maximize Telex's chances for having its petition for certiorari granted, they decided to search for the best available lawyer. They compiled a list of the preeminent antitrust and Supreme Court lawyers in the country, and Roger Wheeler, Telex's Chairman of the Board, settled on Moses Lasky of the Brobeck firm as the best possibility.

Wheeler and his assistant made preliminary phone calls to Lasky on February 3, 4, and 13, 1975 to determine whether Lasky was willing to prepare the petition for certiorari. Lasky stated he would be interested if he was able to rearrange his workload. When asked about a fee, Lasky stated that, although he would want a retainer, it was the policy of the Brobeck firm to determine fees after the services were performed. Wheeler, however, wanted an agreement fixing fees in advance and arranged for Lasky to meet in San Francisco on February 10th to discuss the matter further with Telex's president, Stephen Jatras, and Floyd Walker, its attorney in the IBM litigation.

The San Francisco meeting was the only in-person meeting between Lasky and the Telex officials on the subject of Brobeck's compensation. Jatras told Lasky that Wheeler preferred a contingency fee arrangement. Lasky replied that he had little experience with such arrangements but proposed a contingency fee of 5% of either the judgment or settlement. Jatras

thought there should be a ceiling and someone proposed that the ceiling be set at 5% of the first $100 million. Jatras also proposed that anything due IBM on its counterclaim judgment be deducted before calculating the 5% fee. Lasky rejected this, but suggested as a compromise that the amount of the counterclaim judgment be deducted if Telex received $40 million or less in judgment or settlement.

Lasky added that if there was to be ceiling on the contingent fee, there ought to be a minimum fee as well, and suggested that the minimum fee be $1 million. In his deposition, Jatras acknowledged that Lasky proposed a minimum fee, but disputed the other participants' account of the remainder of the discussion. According to Jatras, he told Lasky that Telex would not pay a minimum fee "unless we got something to pay it from." Lasky denied hearing such a proposal. The parties reached no final agreement at the San Francisco meeting. Jatras and Walker returned to Tulsa to discuss the meeting with the Telex management, while Lasky conferred with his partners.

The next day Walker drafted a memorandum to Jatras recounting the San Francisco meeting and including a proposed fee agreement. Jatras and Walker made some changes on the Walker draft agreement, and as modified, sent the proposed fee agreement to Lasky with a cover letter. The pertinent portion of this proposal, paragraph three, is set forth below:

Once a Petition for Writ of Certiorari has been filed with the Clerk of the United States Supreme Court then Brobeck will be entitled to the payment of an additional fee in the event of a recovery by Telex from IBM by way of settlement or judgment in excess of the counterclaim judgment; and, such additional fee will be 5% of the first $100,000,000.00 of such recovery, the maximum contingent fee to be paid is $5,000,000.00 and the minimum is $1,000,000.00.

On the day he received the letter and proposed fee agreement, Lasky telephoned Jatras to tell him the proposal was not

acceptable and that he would draft changes. Later that same day, Lasky sent to Jatras a letter in which he agreed to represent Telex and enclosed a memorandum agreement. This agreement, which Lasky had already signed, is set forth in full:

## MEMORANDUM

1. Retainer of $25,000.00 to be paid. If Writ of Certiorari is denied and no settlement has been effected in excess of the Counterclaim, then the $25,000.00 retainer shall be the total fee paid; provided however, that

2. If the case should be settled before a Petition for Writ of Certiorari is actually filed with the Clerk of the Supreme Court, then the Brobeck firm would bill for its services to the date of settlement at an hourly rate of $125.00 per hour for the lawyers who have worked on the case; the total amount of such billing will be limited to not more than $100,000.00, against which the $25,000.00 retainer will be applied, but no portion of the retainer will be returned in any event.

3. Once a Petition for Writ of Certiorari has been filed with the Clerk of the United States Supreme Court then Brobeck will be entitled to the payment of an additional fee in the event of a recovery by Telex from IBM by way of settlement or judgment of its claims against IBM; and, such additional fee will be five percent (5%) of the first $100,000,000.00 gross of such recovery, undiminished by any recovery by IBM on its counterclaims or cross-claims. The maximum contingent fee to be paid is $5,000,000.00, provided that if recovery by Telex from IBM in less than $40,000,00.00 gross, the five percent (5%) shall be based on the net recovery, i. e., the recovery after deducting the credit to IBM by virtue of IBM's recovery on counterclaims or cross-claims, but the contingent fee shall not then be less than $1,000,000.00.

4. Once a Writ of Certiorari has been granted, then Brobeck will receive an additional $15,000.00 retainer to cover briefing and arguing in the Supreme Court.

5. Telex will pay, in addition to the fees stated, all of the costs incurred with respect to the prosecution of the case in the United States Supreme Court.

Jatras signed Lasky's proposed agreement, and on February 28 returned it to Lasky with a letter and a check for $25,000 as the agreed retainer. To "clarify" his thinking on the operation of the fee agreement, Jatras attached a set of hypothetical examples to the letter. This "attachment" stated the amount of the fee that would be paid to Brobeck assuming judgment or settlements in eight different amounts. In the first hypothetical, which assumed a settlement of $18.5 million and a counterclaim judgment of $18.5 million, Jatras listed a "net recovery" by Telex of "$0" and a Brobeck contingency fee of "$0." [1]

Lasky received the letter and attachment on March 3. Later that same day he replied:

Your attachment of examples of our compensation in various contingencies is

1. The attachment in full provided:

| Assumed Gross Judgment or Settlement on Antitrust Case | Assumed Judgment or Settlement on Counterclaim | Net Recovery by Telex | Brobeck Contingent Fee | Comment |
|---|---|---|---|---|
| $ 18,500,000 | $18,500,000 | $ 0 | $ 0 | |
| 20,000,000 | 18,500,000 | 1,500,000 | 1,000,000 | Minimum Fee |
| 30,000,000 | 18,500,000 | 11,500,000 | 1,000,000 | Minimum Fee |
| 39,000,000 | 18,500,000 | 20,500,000 | 1,025,000 | 5% of Net |
| 40,000,000 | 18,500,000 | 21,500,000 | 2,000,000 | 5% of Gross |
| 60,000,000 | 18,500,000 | 41,500,000 | 3,000,000 | 5% of Gross |
| 100,000,000 | 18,500,000 | 81,500,000 | 5,000,000 | Maximum Fee |
| 150,000,000 | 18,500,000 | 131,500,000 | 5,000,000 | Maximum Fee |

2/27/75

correct, it being understood that the first example is applicable only to a situation where the petition for certiorari has been denied, as stated in paragraph 1 of the memorandum.

No Telex official responded to Lasky's letter.

Lasky, as agreed, prepared the petition for certiorari and filed it in July 1975. He also obtained a stay of mandate from the Tenth Circuit pending final disposition of the action by the Supreme Court. In the meantime Telex began to consider seriously the possibility of settlement with IBM by having Telex withdraw its petition in exchange for a discharge of the counterclaim judgment. Telex officials planned a meeting to discuss whether to settle on this basis, and Walker asked Lasky to attend in order to secure Lasky's advice on the chances that the petition for certiorari would be granted.

The meeting was held on September 5. Lasky told the assembled Telex's officials that the chances that the petition for certiorari would be granted were very good. Wheeler, however, was concerned that if the petition for certiorari was denied, the outstanding counterclaim judgment would threaten Telex with bankruptcy. Wheeler informed Lasky that Telex was seriously considering the possibility of a "wash settlement" in which neither side would recover anything and each would release their claims against the other. Lasky responded that in the event of such a settlement he would be entitled to a fee of $1,000,000. Wheeler, upon hearing this, became emotional and demanded to know from the others present whether this was what the agreement provided. Walker agreed that it had. Jatras said he didn't know and would have to read the correspondence.

Two days later Jatras wrote a memorandum for the Telex Board of Directors in which he stated:

"Lasky claims that his deal guarantees him $1 million fee in the event that Telex settles after the Petition for Writ is filed if the settlement is at least a 'wash' with the counterclaim judgment."

Wheeler doesn't agree that the Lasky interpretation is correct and has asked Jatras to review his notes and recollections of this matter. Jatras has done so and has no independent knowledge beyond the documents.

Having returned to San Francisco, Lasky, at Telex's request, prepared a reply brief to IBM's opposition to the petition for certiorari, and sent it to the Supreme Court on September 17th for filing. In the meantime, Wheeler opened settlement discussions with IBM. He telephoned Lasky periodically for advice.

On October 2 IBM officials became aware that the Supreme Court's decision on the petition was imminent. They contacted Telex and the parties agreed that IBM would release its counterclaim judgment against Telex in exchange for Telex's dismissal of its petition for certiorari. On October 3, at the request of Wheeler and Jatras, Lasky had the petition for certiorari withdrawn. Thereafter, he sent a bill to Telex for $1,000,000. When Telex refused to pay, Brobeck filed its complaint. On the basis of depositions and exhibits, the district court granted Brobeck's motion for summary judgment.

In a somewhat contradictory fashion, Telex contends on appeal that a number of genuine issues of fact exist with respect to Brobeck's motion for summary judgment but that none exists concerning its own motion. Telex argues that it, not Brobeck, is entitled to summary judgment, or alternatively, to go to trial to determine the meaning of the contract. Telex raises three contentions:

1) Brobeck was discharged by Telex, and therefore, Brobeck was limited to recovering the reasonable value of its services;

2) the correct interpretation of the contract requires resolution of disputed factual issues;

3) the fee awarded under the contract was so excessive as to render it unconscion-

able. We discuss each of these contentions in turn.

## I

### Discharge

Telex contends that, under California law,[2] if a client who has retained an attorney on a contingent fee basis discharges the attorney before the contingency has occurred, the attorney is limited to recovering the reasonable value of the services rendered. *See Fracasse v. Brent,* 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9 (1972). Telex contends there is a factual dispute as to whether Brobeck was discharged, and summary judgment was therefore inappropriate.

This contention borders on frivolousness. As Telex concedes, it never formally discharged Brobeck. Nor did it say or do anything from which an intent to terminate Brobeck prematurely could be inferred. Lasky, as agreed, prepared and filed the petition for a writ of certiorari. Even after the September 5, 1975 meeting with Telex, Lasky continued to render services to Telex. He prepared and filed a reply to IBM's response to the petition for certiorari, and during the settlement discussions with IBM, he advised Telex on the appropriateness of settlement when consulted by Telex officials.

Telex does not dispute these facts. It argues instead that "by relieving Brobeck of the task of pursuing the appeal (by its settlement with IBM), Telex discharged Brobeck as plainly as if the word 'discharge' was used." This analysis begs the question. Only if we assume that the wash settlement did not make the contingent fee clause operative is this line of reasoning persuasive. To make this assumption, however, we would have to adopt Telex's interpretation of the contract. This we cannot do. It is the very interpretation of the contract that is the central issue on this appeal, a matter to which we now turn.

## II

### Interpretation

Paragraph three of the memorandum agreement provided that Brobeck was entitled to an additional fee "in the event of a recovery by Telex from IBM by way of settlement or judgment of its claims against IBM." Telex contends that the wash settlement reached by IBM and Telex was not such a recovery because the contract contemplated that Brobeck would be entitled to its contingent fee only if Telex actually received money in settlement of its suit with IBM. Telex contends that as a result of this "ambiguity," what the parties actually intended the contract to mean, as evidenced by their words and conduct, is a factual matter that cannot be resolved on a motion for summary judgment.

Under California law, the determination of whether a written contract is ambiguous is a question of law that must be decided by the court. *Airborne Freight Corp. v. McPherson,* 427 F.2d 1283, 1285 (9th Cir. 1970) (interpreting California law); *Brant v. California Dairies, Inc.,* 4 Cal.2d 128, 133, 48 P.2d 13 (1935). Even if the written agreement is clear and unambiguous on its face, the trial judge must receive relevant extrinsic evidence that can prove a meaning to which the language of the contract is "reasonably susceptible." *Pacific Gas and Electric Co. v. G. W. Thomas Drayage Co.,* 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). If the court finds after considering this preliminary evidence that the language of the contract is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract. *Airborne Freight Corp.,* 427 F.2d at 1286; *Pacific Gas & Electric Co.,* 69 Cal.2d at 39, 69 Cal.Rptr. at 565, 442 P.2d at 645. The case may then be disposed of by summary judgment. *Airborne Freight Corp.,* 427 F.2d at 1286; *see Parish v. Howard,* 459 F.2d 616, 619 (8th Cir. 1972), because interpretation of the unambiguous

---

2. The parties have assumed throughout that California law should be applied. We make the same assumption here.

contract is solely a question of law. *Gardiner v. Gaither*, 162 Cal.App.2d 607, 614, 329 P.2d 22 (1958).

■■■ In performing our judicial function of interpretation, we note that "it is beyond question that every provision of a contract should be examined to determine the meaning and intention of the parties. . . . the meaning of words contained in a contract is to be determined not from a consideration of the words alone but from a reading of the entire contract." *Sunset Securities Co. v. Coward McCann, Inc.*, 47 Cal.2d 907, 911, 306 P.2d 777, 779 (1957). We seek to interpret the contract in a manner that makes the contract internally consistent.

Paragraph one of the agreement provided that:

1. Retainer of $25,000.00 to be paid. If Writ of Certiorari is denied and no settlement has been effected in excess of the Counterclaim, then the $25,000.00 retainer shall be the total fee paid; provided, however, that

Thus, paragraph one narrowly limits Brobeck's fee to its $25,000 retainer to one situation: where there has been no settlement in excess of the counterclaim *and* where the writ of certiorari has been denied. Telex would have us construe the agreement as if the conditions stated in this paragraph were fulfilled, which they were not. Rather, the language in paragraph one ("provided, however") clearly contemplated a different computation of the fee where the conditions in either of the succeeding two paragraphs were fulfilled.

Paragraph three began with the language "[o]nce a Petition for Writ of Certiorari has been filed with the Clerk of the United States Supreme Court . . . ." Thus, the filing of the petition for certiorari triggered the operation of paragraph three. The paragraph proceeds to outline the manner in which Brobeck's fee would be computed in the event of settlement. The fee was to be contingent on two ranges of settlement. For settlements of less than $100 million but greater than or equal to $40 million, Brobeck's fee would be 5% of the "gross" recovery, i. e., the amount "undiminished by any recovery by IBM on its counterclaims or cross-claims." For any settlement of less than $40 million gross, the 5% would be computed on the "net" recovery—i. e., the recovery after deducting the credit to IBM by virtue of IBM's recovery against Telex—"but the contingent fee shall not then be less than $1,000,000." Because the settlement reached with IBM was for less than $40 million gross, Brobeck was entitled to the $1 million contingent fee.

Telex argues that, because it received no money by virtue of the wash settlement with IBM, there was "no recovery by Telex from IBM by way of settlement or judgment of its claims against IBM," and therefore, the condition on which Brobeck would be paid was never fulfilled.[3] Such a construction would create anomalies in the agreement that we cannot reasonably believe that the parties could have intended. First, Telex's requirement that it receive some cash by way of settlement of its claims against IBM could be satisfied by receipt of $1.00 from IBM. We agree with Brobeck that a construction of the contract that would condition the $1 million fee upon Telex's receipt of any amount of cash, no matter how slight, is untenable. Second, had Telex received $18.5 million from IBM in settlement of its antitrust claim, instead of receiving a discharge from its counterclaim judgment, it would have been in the same position as the wash settlement left it. Yet, Telex does not appear to dispute that in such a situation that Brobeck would be entitled to its $1 million fee. Telex's version of the agreement clearly exalts form

3. Telex discusses at considerable length the meaning of the word "recovery." We do not think that references to other cases for the definition of recovery is particularly useful. The meaning of recovery should be discerned from the context in which the parties themselves used the word. Here, the parties used the word to encompass either a "gross" recovery or a "net" recovery. Because the net recovery language was operative as the result of the settlement for less than $40 million, there was a "recovery" within the meaning of the word as the parties used it.

over substance. Finally, Telex's construction of paragraph three is incompatible with paragraph two. Paragraph two provides that if the case is settled before the petition for a writ of certiorari is actually filed, then Brobeck could bill its services on an hourly basis not to exceed $100,000. It makes no sense to interpret paragraph three such that Telex pays less in attorney's fees where the petition is filed than when it is not. Not only would Brobeck have expended more time and effort where it actually completes and files the petition, but it also would have conferred on Telex the ability to use the completed petition as bargaining leverage in its negotiations with IBM. The substantial leverage that Telex gained by having filed a petition for certiorari is an explanation why Telex was willing to pay substantially more for a filed petition,[4] and in fact, Telex appears to have benefited significantly by having filed the petition.[5]

■■■ We conclude, therefore, that the contract was unambiguous on its face. As noted, however, California law allows a party to challenge a contract that is unambiguous on its face, *Pacific Gas & Electric Co.*, 69 Cal.2d at 39–40, 69 Cal.Rptr. at 565, 442 P.2d at 645, and accordingly, Telex presented extrinsic evidence to the district court to show that the contract was susceptible of its interpretation. The district court apparently concluded that this evidence was insufficient reasonably to support Telex's interpretation of the contract. Having carefully reviewed this evidence, taking the facts presented by Telex as true and resolving all doubts in its favor, *see Handi Investment Corp. v. Mobil Oil Corp.*, 550 F.2d 543,

546 (9th Cir. 1977), we agree with the district court. We find that this evidence, if anything, compels our interpretation of the contract.

Three persons were involved in the formation of the Telex-Brobeck agreement: Lasky, Jatras, Telex's president, and Walker, Telex's counsel. In their depositions, Lasky and Walker consistently agreed that the contract should be interpreted in the manner advanced by Brobeck: once the petition for certiorari was filed, Brobeck was entitled to collect at least $1 million unless Telex lost.[6]

The extrinsic evidence advanced by Telex to support its interpretation of the contract consists almost exclusively of Jatras' belief that an additional fee would be paid only if there was a net recovery (i. e., a settlement in excess of the counterclaim judgment). Jatras claims that he expressed his belief to Lasky on several occasions.

■■■ To the extent that Telex is relying on Jatras' subjective belief to establish the meaning of the contract, we must disagree. Under the modern theory of contracts we look to objective, not subjective, criteria in ascertaining the intent of the parties. *See Meyer v. Benko*, 55 Cal.App.3d 937, 127 Cal.Rptr. 846 (1976). Even when we view Jatras's protestations as part of the objective circumstances surrounding the formation of the contract, we find that they do not make the contract reasonably susceptible to Telex's interpretation, because Jatras's words are contradicted by his later actions.

In reviewing the objective criteria, we rely heavily on the documents reflecting the

---

**4.** In his deposition, Jatras stated that, but for the filed petition, "IBM would have no reasons to talk to us about anything."

**5.** According to Walker's deposition the consensus at the February 20 meeting was that a minimum fee was warranted if a petition was filed, because a settlement negotiated after filing would be the result of having filed the petition.

**6.** For instance, Walker wrote to Wheeler after the September 5th meeting:

"In view of your statement that Telex may decide to 'throw in the sponge' I feel I should call to your attention the obligations for attorney fees which Telex will have in the event it pursues that course and a settlement is made by which the antitrust issues are given up in return for cancellation of the Counterclaim judgment.

"My understanding of the arrangement between Telex and the Brobeck firm is that they are to receive a minimum fee of $1 million if settlement is entered into subsequent to the filing of the Petition for Writ."

negotiations between Telex and Brobeck. These documents more accurately reflect the parties' intent than the hindsight recollections of the parties. This is true particularly in this case because Jatras had no independent recollection of the negotiations. Two days after the stormy September 5 meeting, Jatras wrote the previously quoted memorandum for the Telex Board of Directors in which Jatras stated:

> Wheeler doesn't agree that the Lasky interpretation is correct and has asked Jatras to review his notes and recollections of this matter. Jatras has done so and has no independent knowledge beyond the documents.

At his deposition, Jatras further stated that when Wheeler asked him at the September 5 meeting what the contract said, he told Wheeler that he did not know, and would have to review all the letters.

■ In particular, we address the significant differences between the paragraph three that was proposed by Jatras and rejected by Lasky,[7] and the version of paragraph three that was proposed by Lasky and agreed to by Jatras. To highlight the distinctions we set them forth as follows, underlining the pertinent sections:

### PARAGRAPH 3 REJECTED

"Once a Petition for Writ of Certiorari has been filed with the Clerk of the United .States Supreme Court then Brobeck will be entitled to the payment of an additional fee in the event of a recovery by Telex from IBM by way of settlement or judgment in excess of the counterclaim judgment; and, such additional fee will be 5% of the first $100,000,000.00 of such recovery, the maximum contingent fee to be paid is $5,000,000.00 and the minimum is $1,000,000.00."

### PARAGRAPH 3 OF THE EXECUTED CONTRACT

"Once a Petition for Writ of Certiorari has been filed with the Clerk of the Unit-

ed States Supreme Court then Brobeck will be entitled to the payment of an additional fee in the event of a recovery by Telex from IBM by way of settlement or judgment of its claims against IBM; and, such additional fee will be five percent (5%) of the first $100,000,000.00 gross of such recovery, undiminished by any recovery by IBM on its counterclaims or cross-claims. The maximum contingent fee to be paid is $5,000,000.00, provided that if recovery by Telex from IBM is less than $40,000,000.00, the five percent (5%) shall be based on the net recovery, i. e., the recovery after deducting the credit to IBM by virtue of IBM's recovery on counterclaims or cross-claims, but the contingent fee shall not then be less than $1,000,000.00."

From the above, it appears that the construction of the contract that Telex is presently advancing on appeal is the one contained in the version that was rejected by Brobeck. Telex explicitly proposed that Brobeck would be entitled to an additional fee in the event of a recovery in "excess of the counterclaim judgment." In other words, Telex proposed a contract whereby it would pay Brobeck only if Telex recovered an amount in excess of the amount owed on the counterclaim judgment. Brobeck, however, by excluding this limitation in its version sent Telex and to which the parties finally agreed, specifically rejected such a contract. We think that the only correct inference to be drawn from the omission of Telex's proposal. in the final contract is that the parties agreed that Brobeck would be entitled to its additional fee in the event of a settlement between IBM and Telex, without regard to whether the amount of settlement was greater than the counterclaim judgment.

■ The events surrounding the cryptic "attachment" that Jatras sent to Brobeck after the contract was signed also belie Telex's interpretation of the contract. The

---

7. The parties dispute whether it was Jatras or Walker who added the final changes in the draft that was finally sent to Lasky. We attach

no significance to whether Jatras or Walker made these changes, and therefore, this factual dispute is not "material."

first example in the series of eight hypotheticals supports Jatras's interpretation that the contingent fee would be paid only if there was a net recovery to Telex.[8] Lasky, by a return letter, promptly disagreed with this interpretation, stating that it applied only in the situation when the petition for certiorari was denied. As Telex admitted in a request for admission:

> neither Mr. Jatras nor anyone else connected with defendants at any time wrote or spoke to Mr. Lasky concerning any statement in the letter of March 3, 1975, and particularly concerning the last paragraph . . . .

We regard Telex's inaction as acquiescing to Brobeck's interpretation of the contract.

Thus, we find that the extrinsic evidence offered by Telex did not make the contract reasonably susceptible to its interpretation. The contract remained unambiguous and disposition of the case by summary judgment was appropriate. *See Airborne Freight Corporation*, 427 F.2d at 1286.

### III

Finally, Telex contends that the $1 million fee was so excessive as to render the contract unenforceable. Alternatively it argues that unconscionability depends on the contract's reasonableness, a question of fact that should be submitted to the jury.

Preliminarily, we note that whether a contract is fair or works an unconscionable hardship is determined with reference to the time when the contract was made and cannot be resolved by hindsight. *Yeng Sue Chow v. Levi Strauss & Co.*, 49 Cal. App.3d 315, 325, 122 Cal.Rptr. 816 (1975).

There is no dispute about the facts leading to Telex's engagement of the Brobeck firm. Telex was an enterprise threatened with bankruptcy. It had won one of the largest money judgments in history, but that judgment had been reversed in its entirety by the Tenth Circuit. In order to maximize its chances of gaining review by the United States Supreme Court, it sought to hire the most experienced and capable lawyer it could possibly find. After compiling a list of highly qualified lawyers, it settled on Lasky as the most able. Lasky was interested but wanted to bill Telex on hourly basis. After Telex insisted on a contingent fee arrangement, Lasky made it clear that he would consent to such an arrangement only if he would receive a sizable contingent fee in the event of success.

In these circumstances, the contract between Telex and Brobeck was not so unconscionable that "no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other." *Swanson v. Hempstead*, 64 Cal.App.2d 681, 688, 149 P.2d 404, 407 (1944). This is not a case where one party took advantage of another's ignorance, exerted superior bargaining power, or disguised unfair terms in small print. Rather, Telex, a multi-million corporation, represented by able counsel, sought to secure the best attorney it could find to prepare its petition for certiorari, insisting on a contingent fee contract. Brobeck fulfilled its obligation to gain a stay of judgment and to prepare and file the petition for certiorari. Although the minimum fee was clearly high, Telex received substantial value from Brobeck's services. For, as Telex acknowledged, Brobeck's petition provided Telex with the leverage to secure a discharge of its counterclaim judgment, thereby saving it from possible bankruptcy in the event the Supreme Court denied its petition for certiorari. We conclude that such a contract was not unconscionable.

8. It appears from Walker's deposition that Jatras knew when he sent the attachment that it was not in accord with the agreement. Walker:

> the purpose of the attached examples were to attempt to get Mr. Lasky to agree that if there was no net recovery by Telex, there would be no Brobeck contingency fee, and it was to get him to commit himself to agree to that, and that was my recollection of the purpose of the letter being written.
> Q. Did Mr. Jatras say to you why he wanted Mr. Lasky to commit himself to agree to that?
> A. Yes, because he felt that the memorandum as signed might not provide that . . ."

The judgment of the district court is affirmed.