BRINDERSON–NEWBERG JOINT VENTURE; Brinderson Corporation; Gust K. Newberg Corporation; Frank J. Loscavio; Brinderson Constructors, Inc., Plaintiffs - counter - defendants - Appellants,

v.

PACIFIC ERECTORS, INC.; Hartford Accident & Indemnity Company, Defendants-counter-claimants-Appellees.

BRINDERSON–NEWBERG JOINT VENTURE; Brinderson Corporation; Gust K. Newberg Corporation; Frank J. Loscavio; Brinderson Constructors, Inc., Plaintiffs - counter - defendants - Appellees,

v.

PACIFIC ERECTORS, INC.; Defendant-counter-claimant,

and

Hartford Accident & Indemnity Company, Defendant-counter-claimant-Appellant.

BRINDERSON–NEWBERG JOINT VENTURE; Brinderson Corporation; Gust K. Newberg Corporation; Frank J. Loscavio; Brinderson Constructors, Inc., Plaintiffs - counter - defendants - Appellees,

v.

PACIFIC ERECTORS, INC.; Defendant-counter-claimant, Appellant,

and

Hartford Accident & Indemnity Company, Defendant-counter-claimant.

Nos. 90–55308, 90–55372, 90–55374, 90–55376 and 90–55378.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1992.

Decided July 20, 1992.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 22, 1992.

274

John D. Alkire, Perkins Coie, Michael Himes, Seattle, Wash., for appellants Brinderson–Newberg Joint Venture, Brinderson Corp., Gust K. Newberg Corp., Frank J. Loscavio, and Brinderson Constructors, Inc.

William B. Moore and Arnold R. Hedeen, Ferguson & Burdell, Seattle, Wash. for appellee Pacific Erectors, Inc. and William I. Chertok, Bryan Cave, Santa Monica, Cal., for appellee Hartford Acc. and Indem. Co.

Before POOLE, WIGGINS, and LEAVY, Circuit Judges.

WIGGINS, Circuit Judge:

## OVERVIEW

This appeal stems from a contract dispute between a general contractor, Brinderson–Newberg Joint Venture (Brinderson), a subcontractor, Pacific Erectors (Pacific), and the bonding company that issued Pacific's performance bond, Hartford Accident & Indemnity Company (Hartford). Brinderson appeals the district court's denial of Brinderson's motions for a directed verdict and for JNOV. Brinderson argues that a directed verdict or JNOV was necessary because the jury verdicts on Brinderson's contract claim and Pacific's fraud claim were dependent on inadmissible parol evidence. Brinderson also appeals the directed verdict eliminating Brinderson's bad faith claim against Hartford, and Hartford cross-appeals the district court's grant of summary judgment in favor of Brinderson on Hartford's fraud and misrepresentation claims and an adverse directed verdict on Hartford's implied covenant tort claim.

The district court had diversity jurisdiction over this contract dispute under 28 U.S.C. § 1332 (1988). A timely notice of appeal was filed after the entry of judgment, and this court has jurisdiction pursuant to 28 U.S.C. § 1291 (1988).

## BACKGROUND

In May 1985, the United States Navy awarded Brinderson a contract to construct a coal-fired power plant at the Puget Sound Naval Shipyard in Bremerton, Washington. In June 1985, Brinderson entered into negotiations with Pacific, one of the subcontractors who had submitted a low bid for certain erection work. Part of these negotiations focused on the erection of the Flue Gas System (FGS), a large pollution control system. As part of its $1.54 million pre-contract bid, Pacific offered to erect the support steel for the FGS for $257,000. Brinderson, however, wanted Pacific to erect the large steel FGS components along with the support steel.

The negotiations between Brinderson and Pacific took place in three meetings, the first in late June 1985, the second on July 29, 1985, and the third on August 16, 1985. Many of the relevant facts concerning the negotiations are disputed. Brinderson claims that Pacific agreed to erect the FGS as part of an agreement to increase Pacific's scope of work and bid price. Although Pacific admits that the scope of its work and the corresponding contract price were increased as part of the negotiations,[1] it emphatically denies that the FGS components were included in the agreement. Pacific alleges that Brinderson never indicated that the FGS components were to be erected by Pacific and that Brinderson only asked that Pacific "pick and set" the FGS components.

After the second meeting, Brinderson drafted a contract reflecting the parties' agreement and sent a copy to Pacific for review. Article 1(e)I.A., section 15603 of the contract required Pacific to "erect complete" the FGS equipment. Article 33, paragraph 16 of the contract stated that Pacific "shall erect complete the Govern-

ment Furnished Flue Gas System including Bag Houses, Scrubbers, I.D. Fans, Breeching and Dampers, Steel Gratings and appurtenances to make a complete installation." Pacific reviewed these provisions along with the other parts of the contract in preparation for the final negotiations and signing of the contract on August 16, 1985. Hartford also reviewed the contract and issued a performance bond for Pacific on August 13, 1985.

At the August 16 meeting, Pacific and Brinderson reviewed the contract line by line and negotiated a number of changes or clarifications concerning Pacific's scope of work. Both parties remember that Pacific requested that Brinderson change article 1(e)I.A. section 15603 and article 33, paragraph 16 to limit Pacific's work on the FGS components to picks and sets. Brinderson contends that it refused to make the change because it expected Pacific to erect the components and that Pacific agreed to erect the FGS components. Pacific and Hartford contend that no change was made because Brinderson assured Pacific that the language only required picks and sets for the FGS components and that article 1(a) limited the scope of work to jobs that Pacific customarily performed. According to Pacific and Hartford, Brinderson claimed that it just did not want to take the time to write the pick and set agreement into the contract. Pacific signed the contract at the end of the August 16 meeting. Pacific admits that it understood the effect of the integration clause in the contract and that the contract was a completely integrated agreement.

Brinderson and Pacific performed under the contract until the summer of 1986, when a dispute arose concerning the erection of the FGS components. Brinderson claimed that Pacific was required to erect the components under the contract. Pacif-

---

**1.** Pacific attempts to downplay the fact that the scope of work and contract price were increased during the negotiations. Pacific suggests that the final scope of work and contract price were approximately the same as the scope and price in Pacific's original bid, demonstrating that Pacific never agreed to erect the FGS components. This characterization turns on Pacific's internal estimates and its bids to other

contractors. Although it does help to explain Pacific's subjective intent, this characterization of the negotiations ignores that Pacific's original bid to Brinderson was for $1.54 million and included less work than the final contract for $2.84 million. Between Brinderson and Pacific, the scope and compensation for Pacific's work was increased during the negotiations.

ic contended that it was only required to pick and set the components while Brinderson erected the components. Brinderson points out that Pacific started to erect the FGS components and then suddenly stopped, suggesting that Pacific knew it was obligated to erect the FGS components. There is some evidence, however, tending to show that Pacific performed part of the disputed work on the assumption that Brinderson would pay extra work compensation for erecting the FGS components.

Brinderson made a claim on the performance bond on September 22, 1986. Hartford made a limited investigation of Brinderson's claim, determined that a genuine issue existed concerning the interpretation of the contract, and refused to pay Brinderson's claim on the bond until liability was established. The dispute eventually resulted in Brinderson's contract claims against Pacific and Hartford, Pacific's fraud claim against Brinderson, Hartford's fraud and implied covenant tort claims against Brinderson, and Brinderson's claim that Hartford conducted its investigation in bad faith.[2] At trial, the district court allowed the jury to hear Pacific's allegations that Brinderson promised to interpret the contract to limit Pacific's work to picks and sets on the FGS. Brinderson objected to this evidence, arguing that it violated the parol evidence rule.

## DISCUSSION

The primary issue in this appeal is the admission of parol evidence over the objections of Brinderson. The most important and prejudicial parol evidence is Pacific's allegation that Brinderson made an oral promise to interpret the contract in a way that limited Pacific's obligations under the contract. This parol evidence was used to support both (1) Pacific's defense to Brinderson's contract claim and (2) Pacific's fraud claim against Brinderson. The contract provides, and the parties agree, that California law governs the parties' claims.

Brinderson argues that California law on the parol evidence rule required the exclusion of the parol evidence and that the district court erred in allowing the jury to consider the parol evidence. As is explained in more detail below, the determinative issue underlying both the contract and fraud claims is the same: Whether the contract itself is reasonably susceptible of Pacific's proffered interpretation of the agreement.

### I. Brinderson's Contract Claim

The contract required Pacific to "erect complete" the FGS. Pacific interpreted the phrases "erect complete" and "make a complete installation" to mean that the contract required Pacific to complete the structural and miscellaneous steel, such as steel gratings and appurtenances, but required only pick and sets for the components of the FGS. Under Pacific's understanding, Pacific only had to complete the work to the extent that it had customarily completed similar work as a subcontractor. In other words, Pacific was required to "erect complete" only a portion of the FGS, not the entire system.

To advance its interpretation of the contract, Pacific introduced parol evidence at trial alleging that, before the contract was signed, Brinderson orally assured Pacific that the phrases "erect complete" and "make a complete installation" only meant that Pacific had to complete the structural and miscellaneous steel work for the FGS. Brinderson denies making such representations and contends it was clear that Pacific was required to erect and install the entire FGS. Brinderson argues that the district court erred by allowing the jury to hear and consider this parol evidence.

### A. The Law

■ Under California contract law, the parol evidence analysis governing this case is divided into two initial inquiries: "1) was the writing intended to be an integration, i.e. a complete and final expression of the

---

**2.** Although other claims existed in this litigation, they are not relevant to the issues on appeal.

parties' agreement, precluding any evidence of collateral agreements [citation]; and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence?" *Gerdlund v. Electronic Dispensers Int'l,* 190 Cal.App.3d 263, 235 Cal.Rptr. 279, 282 (Ct.App.1987) (citing *Masterson v. Sine,* 68 Cal.2d 222, 65 Cal. Rptr. 545, 436 P.2d 561 (Cal.1968) and *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968)); *see also Banco Do Brasil v. Latian, Inc.,* 234 Cal. App.3d 973, 285 Cal.Rptr. 870, 886 (Ct.App. 1991) (applying the same test), *review denied,* (Jan. 23, 1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 588(1992).

The first inquiry is easily resolved. All the parties agree that the written contract is a completely integrated agreement. Thus, parol evidence of terms not specifically included in the written contract is not admissible. *Masterson,* 65 Cal.Rptr. at 547, 436 P.2d at 563. In this regard, California follows the great weight of authority on the application of the parol evidence rule. *See, e.g., Restatement (Second) of Contracts* § 213(1)–(2) (1979). This rule discourages interested witnesses to a contract from committing fraud, perjury, or unintentional invention by making statements that the contract did not actually represent the agreement of the parties. The parol evidence rule also discourages sympathetic juries from releasing parties from bad bargains. *Masterson,* 65 Cal. Rptr. at 548, 436 P.2d at 564.

■ However, California also recognizes one of the broad exceptions to the parol evidence rule. Because "[n]o contract should ever be interpreted and enforced with a meaning that neither party gave it," 3 Arthur L. Corbin, *Corbin on Contracts* § 572B (rule no. 2) (West Supp.1991), parol evidence may be introduced to show the meaning of the express terms of the written contract. *See, e.g., Pacific Gas & Elec.,* 442 P.2d at 643–45, 69 Cal.Rptr. 563–565.

To avoid completely eviscerating the parol evidence rule, however, there must be reasonable harmony between the parol evidence and the integrated contract for the evidence to be admissible. Thus, the parol evidence issues in this case turn on the second inquiry—whether the written contract is susceptible of the meaning that Pacific gives to it. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is ... whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Gerdlund,* 235 Cal.Rptr. at 283 (quoting *Pacific Gas & Elec.,* 442 P.2d at 644, 69 Cal.Rptr. 564); *Banco Do Brasil,* 285 Cal. Rptr. at 891.

The precise issue is whether the terms "erect complete" and "make a complete installation," when read in context with the rest of the contract, are reasonably susceptible of the meaning Pacific attempts to advance through its parol evidence. "If the court finds after considering this preliminary evidence that the language of the contract is not reasonably susceptible of [the proffered] interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract." *Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 871 (9th Cir.) (applying California law), *cert. denied,* 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

### B. Standard of Review

■ Whether the written contract is reasonably susceptible of a proffered meaning is a matter of law that is reviewed de novo. *See, e.g., United States v. King Features Entertainment,* 843 F.2d 394, 398 (9th Cir. 1988) ("Interpretation of a contract is a matter of law, including whether the contract is ambiguous."); *Brobeck,* 602 F.2d at 871 ("Under California law, the determination of whether a written contract is ambiguous is a question of law that must be decided by the court."); *Banco Do Brasil,* 285 Cal.Rptr. at 885–86 (whether a contract is reasonably susceptible of a meaning advanced by parole evidence is a question of law reviewed de novo).

### C. The Contract Is Not Susceptible of Pacific's Interpretation

The contract language is not reasonably susceptible of the meaning proffered by Pacific. We find as a matter of law that the contract is unambiguous and required Pacific to erect both the structural and miscellaneous steel *and* the FGS components.

Even if all of Pacific's evidence is accepted as fact and all reasonable inferences are drawn in favor of Pacific, Pacific merely shows that the parties orally agreed before the contract was signed that they would both interpret the phrases "erect complete" and "make a complete installation" to mean something else, despite the plain language of the contract itself. If Pacific did indeed make such an oral agreement with Brinderson, it did so at its own peril because the completely integrated contract negates any such agreement. The law recognizes the written integrated contract as the final word on the actual agreement of the parties and requires that the contract itself be reasonably susceptible of Pacific's proffered meaning.

Article 33, paragraph 16 of the contract sets forth the work that is expressly included in the contract:

> Subcontractor shall erect complete the Government Furnished Flue Gas System including Bag Houses, Scrubbers, I.D. Fans, Breeching and Dampers, Steel Gratings and appurtenances to make a complete installation.

By Pacific's own admission, the normal meaning of "erect complete" and "make a complete installation" in the construction industry includes field assembly, picking and setting, and bolting and welding the relevant components into permanent position. Pacific argues that the phrase "erect complete" applies only to the steel gratings and appurtenances, while the phrase "pick and set" applies to the FGS components. Simply put, the language of article 33, paragraph 16 is not susceptible of such a construction.

Pacific's construction of the contract rests primarily upon article 1(a) which states

> the work includes the following: (a) Any item of labor, service, and/or material reasonably inferred by the plans and/or specifications *or* customarily furnished by a subcontractor performing work in this line;

(emphasis added). Pacific argues that this language limited the scope of its contractual obligations to work Pacific had customarily performed. This construction of the contract is implausible for four reasons.

First, article 1(a) is phased in the disjunctive and requires Pacific to perform work inferred by the specifications "or" work inferred by customary practices of subcontractors who perform such work. Pacific cannot refuse to perform work inferred by the specifications by claiming that Pacific did not customarily perform such work. To limit the scope of work to jobs Pacific customarily performed, article 33 would have to be phrased in the conjunctive, requiring Pacific to perform work only if inferred by the specifications *and* "customarily furnished by a subcontractor performing work in this line." Fairly read, article 1(a) requires Pacific to perform any "customarily furnished" work in addition to the work explicitly set out in the contract.

Moreover, even if the word "or" could be read as "and," the scope of the work would not be limited to work that Pacific customarily performs, but to work "customarily furnished by a subcontractor performing work in this line." By agreeing to "erect complete" the FGS, Pacific agreed to perform work customarily performed by contractors who "erect complete" similar structures. In other words, the work that is "customarily furnished by a subcontractor performing work in this line" can only be evaluated by comparing the work that Pacific agreed to perform in the contract with similar work performed by subcontractors in that line. Whether Pacific had customarily performed similar work is irrelevant to whether Pacific agreed to perform certain work under the contract.

Second, Pacific's interpretation of article 1(a) violates a fundamental rule of contract interpretation because it would render other portions of the contract meaningless. It

is well settled that a contract should be interpreted so as to give meaning to each of its provisions: "Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." *Restatement (Second) of Contracts* § 203(a) cmt. b (1979); *see* Cal.Civ.Code § 1641 (West 1985); *Continental Mfg. Corp. v. Underwriters at Lloyds London,* 185 Cal.App.2d 545, 8 Cal.Rptr. 276, 278 (Dist.Ct.App.1960) ("It is a cardinal rule in interpretation of contracts that the contract is to be taken by its four corners and so construed as to give effect to every part of it, if possible."); *Brobeck,* 602 F.2d at 872 (contracts should be interpreted to be "internally consistent"); *Restatement of Contracts* § 235(c) (1932) ("A writing is interpreted as a whole"). If article 1(a) is interpreted to be a limitation on the scope of work, it would conflict with article 1(e) and render it meaningless.

Article 1(e) is actually entitled "Scope of Work" and states that the "Subcontractor agrees to make the entire project complete in every respect insofar as this subcontract is concerned ... in strict accordance with the Plans and Specifications ... and Submittals as approved by the Owner." Under article 1(e)I.A. section 15603, Pacific is required to "erect complete" the FGS. Pacific's interpretation of article 1(a) would render this language useless.[3] Moreover, Pacific's interpretation conflicts with the detailed description of included work set forth in article 33, paragraph 16, and renders that provision meaningless.

Third, Pacific's interpretation stands the usual rules of interpretation on their head by arguing that a general provision governs more specific provisions. It is well settled that "[w]here there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions." *Restatement of Contracts* § 236(c) (1932); *see also Autry v. Republic*

*Prods.,* 30 Cal.2d 144, 180 P.2d 888, 893 (1947) (a specific provision is controlling over any general provision); *Restatement (Second) of Contracts* § 203(c) & cmt. e (1979). Thus, even if article 1(a) could be viewed as ambiguous and therefore inconsistent with the specific descriptions of work in article 33, paragraph 16, and article 1(e)I.A., the more specific descriptions requiring Pacific to "erect complete" the FGS must control.

Fourth and finally, "[w]here written provisions are inconsistent with printed provisions, an interpretation is preferred which gives effect to the written provisions." *Restatement of Contracts* § 236(e) (1932); *see also* Cal.Civil Code § 1651 (West 1985); *American City Bank v. Zetlen,* 253 Cal. App.2d 548, 61 Cal.Rptr. 311, 315 (Dist.Ct. App.1967); *Restatement (Second) of Contracts* § 203(d) cmt. f ("in cases of inconsistency a handwritten or typewritten term inserted in connection with the particular transaction ordinarily prevails"). Article 1(a) is a boilerplate provision that is part of the printed form, while articles 1(e)I.A. and 33 are specific, typewritten additions to the standard form.

Indeed, Pacific does little to show how the contract itself is reasonably susceptible of Pacific's proffered interpretation. Pacific argues that the language of article 1(e) is ambiguously broad and should be ignored. This argument is meritless because the language cited by Pacific is carefully defined by the operative language in article 1(e)I.A. and article 33, paragraph 16. Pacific's argument that specification section 15603 requires or envisions an erecting contractor and an installing contractor borders on the absurd. Specification section 15603 says nothing about requiring a separate erecting and installing contractor. Finally, Pacific's argument that paragraphs 6 and 16 of article 33 are both limited to support steel is unpersuasive because it ignores that paragraph 6 refers to boiler support steel[4]

---

**3.** The requirements of section 15603 are stated succinctly: "Flue Gas Cleaning Equipment Installation (Government Furnished Property)—erect complete"

**4.** The requirements of article 33, paragraph 6 are stated as follows: "Unload and erect all [Government Furnished Property] and Riley Stoker furnished boiler support steel, stairs and grating as shown including punching as necessary." All parties agree that this language re-

while paragraph 16 refers to the specific FGS components.

At bottom, Pacific's argument is that its construction of article 1(a) and the rest of the contract is reasonable because Brinderson promised that the contract would be interpreted in such a manner. This is not the issue before the court; the issue is whether the contract itself is susceptible of Pacific's proffered interpretation.

■ If strained interpretations are accepted as reasonable, the parol evidence rule will be completely eviscerated, and integrated contracts will be unenforceable. Parties would always be able to introduce parol evidence by arguing that they are advancing an alternative interpretation of the contract, despite the language of the integrated contract itself. Thus, California requires that the language of the instrument is reasonably susceptible of the proffered meaning before parol evidence may be introduced. *Pacific Gas & Elec.,* 442 P.2d at 644, 69 Cal.Rptr. 564; *Gerdlund,* 235 Cal.Rptr. at 283.

Pacific's proffered interpretation stretches the contractual language beyond reasonable limits and violates most applicable rules of contract construction. Therefore, we find (1) that the district court erred in allowing the jury to hear parol evidence supporting Pacific's proffered interpretation[5] and (2) that as a matter of law Pacific's work under the contract included the field assembly, picking and setting, and bolting and welding of the FGS components into permanent position.

### D. The Trial On Damages

■ Because the contract is not susceptible of Pacific's proffered interpretation, the only issue remaining is the amount of damages. In the trial on damages, the parties are bound by the representation they have made to this court. For example, the course of performance under specification section 14501 should be helpful in determining damages. Both parties agree that "erect complete" normally includes the field assembly, picking and setting, and bolting and welding of the relevant components into permanent position, but that certain mechanical work beyond welding and bolting components into place falls outside the scope of erect complete. Indeed, Brinderson's Reply Brief admits that Pacific "erected complete" the Coal Handling System and coal bunkers even though Brinderson still had to perform certain mechanical work. Thus, on remand, Pacific may limit its damages by introducing evidence demonstrating that certain work fell outside the scope of simply bolting and welding the FGS components into place.

### II. Hartford's Liability on the Performance Bond

■ Brinderson sued Hartford on its performance bond obligation. Hartford admits that, if Pacific is liable under the contract, Hartford is liable under the performance bond. Thus, Brinderson is entitled to payment under the performance bond issued by Hartford.

### III. Pacific's Fraud and Misrepresentation Claims

■ Pacific's jury verdict on its fraud and misrepresentation claims is also tainted by the jury's consideration of inadmissible parol evidence. Under California law, par-

quired Pacific to "erect complete" only the boiler support steel, stairs and grating.

**5.** Pacific argues that some evidence should be admitted regardless of the parol evidence rule because Brinderson "opened the door" for the evidence. After reviewing the record, it is clear that Brinderson never opened the door for the admission of the most prejudicial parol evidence—Brinderson's alleged oral promises to interpret the contract according to Pacific's strained interpretation. Thus, Pacific's "opened the door" argument is inapposite.

This "opened the door" argument placed Brinderson in a very awkward catch–22 position at trial. If Brinderson addressed Pacific's allegations on direct, Pacific would claim that Brinderson "opened the door" and waived any parol evidence objection on appeal. On the other hand, if Brinderson avoided opening the door and merely tried to rebut Pacific's allegations, it would appear to the jury that Brinderson was trying to hide something. The record indicates that Brinderson chose the latter course and limited the scope of direct examination.

ol evidence cannot be introduced to show fraud or misrepresentation if the parol evidence contradicts the language of an integrated contract: "[I]f the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible." *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 261 Cal. Rptr. 735, 745 (Ct.App.1989) (quoting *Bank of America Nat'l Trust & Sav. Ass'n v. Lamb Finance Co.*, 179 Cal.App.2d 498, 3 Cal.Rptr. 877, 880 (Dist.Ct.App.1960)). For parol evidence of fraud or misrepresentation to be admissible under California law, "it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, *and not a promise directly at variance with the promise of the writing.*" *Id.* (quoting *Bank of America Nat'l Trust & Sav. Ass'n v. Pendergrass*, 4 Cal.2d 258, 48 P.2d 659, 661 (1935)) (emphasis added).

■ As with the "meaning" exception to the parol evidence rule discussed above, the purposes of the rule will be undermined unless there is some limit to the fraud/misrepresentation exception. Thus, California holds parties responsible for signing integrated contracts and will allow parol evidence of fraud only to the extent it does not contradict the integrated contract.

■ Pacific's fraud and misrepresentation claims rest on Brinderson's alleged promise to interpret the contract as limiting Pacific's obligations to work Pacific had customarily performed despite the explicit language in article 1(e)I.A., section 15603 and article 33, paragraph 16. Because the integrated contract itself is not reasonably susceptible of such an interpretation, Pacific's parol evidence contradicts the plain language of the contract. Thus, Pacific's signing of the contract precludes a fraud claim based on the alleged promise to interpret the contact in a way that contradicts the plain language of the contract.

■ Even if Pacific's allegations are true, article 24 of the contract specifically states that "the parties shall not be bound by, or liable for, any statement, representation, promise, or agreement not specifically set forth in this subcontract." Thus, Pacific should have insisted that Brinderson's promises and representations were put into the contract before it was signed. An integrated contract is given legal significance under California law, and Pacific cannot introduce parol evidence of fraud if the evidence contradicts the integrated contract. *Pendergrass*, 48 P.2d at 661; *Price*, 261 Cal.Rptr. at 745–46.

Pacific errs by suggesting that *Price* casts doubt on the continuing validity of the *Pendergrass* rule and allows parol evidence of fraud in the inducement even if such evidence conflicts with the signed contract. In fact, just the opposite is true. First, *Price* makes it clear that *Pendergrass* is "the governing law." 261 Cal. Rptr. at 746. According to *Price*, the *Pendergrass* rule "is based on an entirely defensible decision favoring the policy considerations underlying the parol evidence [rule] over those supporting a fraud cause of action." *Id.* We agree with this analysis.

Second, *Price* explicitly recognizes that, while the parole evidence rule in general does not bar evidence of fraud in the inducement, the *Pendergrass* rule does preclude proof of such promissory fraud if it contradicts an integrated agreement. *Id.* at 745 (*Pendergrass* resolves "a conflict between the [parol evidence] rule and promissory fraud relating to the principal terms of an agreement"); *see also id.* at 746 ("*Pendergrass* compromises the policies of tort law, but a contrary rule would compromise those of the parol evidence rule"). Indeed, *Price* involved the same type of fraud in the inducement as Pacific alleges here—an oral promise conflicting with the language of an integrated agreement. The court applied the *Pendergrass* rule and held that the parol evidence was inadmissible because it contradicted the written agreement. Just as summary judgment was appropriate in *Price*, judgment in favor of Brinderson is appropriate here because the evidence of the alleged fraud is inadmissible under California law.

The *Price* decision is directly on point and requires the exclusion of Pacific's parol evidence because it contradicts the written agreement. The contract itself is not reasonably susceptible of Pacific's interpretation and is thus inconsistent with Brinderson's alleged oral promise. Therefore, we reverse the fraud verdict and remand the case for entry of judgment in favor of Brinderson.

### IV. Hartford's Fraud and Misrepresentation Claims

Hartford cross-appeals by arguing that the district court erred in granting summary judgment in favor of Brinderson on Hartford's fraud and negligent misrepresentation claims. The district court's grant of summary judgment is reviewed de novo. We review the evidence in the light most favorable to Hartford to determine whether a genuine issue of material fact exists. *See Jewel Cos. v. Pay Less Drug Stores Northwest,* 741 F.2d 1555, 1559 (9th Cir. 1984).

■ Hartford's theory is that Brinderson made false representations that Brinderson would interpret the contract to limit Pacific's scope of work and that these representations in turn induced Hartford to issue the performance bond. Because the contract is not reasonably susceptible of Pacific's interpretation, this theory is precluded as a matter of law. As in the discussion of Pacific's fraud claim above, the parol evidence that Hartford relies upon to avoid summary judgment would be inadmissible. Therefore, we affirm the district court's grant of summary judgment against Hartford's fraud and misrepresentation claims.[6]

### V. Brinderson's Bad Faith Claim Against Hartford

■ Brinderson argues that the district court erred in granting Hartford's motion for a directed verdict against Brinderson's bad faith claim. Brinderson contends that an insurer has a duty to investigate a claim under California law, even if a genuine issue regarding liability for the claim already exists. Hartford replies that there is no duty to investigate if the insurer already has a good faith reason to dispute liability. Thus, the issue is whether an insurer has a duty to conduct a thorough investigation of a claim if a genuine issue concerning the insurer's liability exists. This issue turns on the proper application of California law and is reviewed de novo. *See United States v. McConney,* 728 F.2d 1195, 1201, 1204 (9th Cir.) (en banc) (questions of law and application of law is reviewed de novo), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Although Brinderson's argument is tenable, Hartford's position is the better interpretation of the law. Brinderson relies primarily on *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (Cal.1979), *cert. denied,* 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), for the proposition that failure to conduct a thorough investigation of a claim is a violation of the insurer's obligation of good faith, even if the insurer has a good faith reason to dispute liability for the claim. The *Egan* court did state that "an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Id.* at 146. However, this statement is much broader than the actual holding of *Egan.* The insurer in *Egan* denied the claim without a thorough investigation *and* without any good faith reason to believe that it was not liable for the claim. Indeed,

---

**6.** Hartford also appeals the directed verdict against its implied covenant claim, but argues that the best result is that both Hartford and Brinderson are barred under *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (Ct.App.1984) and *Okun v. Morton,* 203 Cal. App.3d 805, 250 Cal.Rptr. 220 (Ct.App.1988) from converting their contract actions into tort actions. We agree with Hartford that its implied covenant tort action is barred by *Wallis* and *Okun,* and the district court did not err in granting a directed verdict against Hartford's claim.

However, we do not decide whether Brinderson's tort claim is also barred under *Wallis* and *Okun* because we rule against this tort claim on other grounds.

the court's statement in *Egan* was in response to the insurer's argument "that an insurer violates th[e] covenant [of good faith] only if it wrongfully denies a claim knowing it has no reasonable basis for doing so." *Id.* at 144. Thus, *Egan* is inapposite when an insurer does not conduct a more thorough investigation because the insurer already has good reason to dispute liability.

*Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir.1988), was a case much more like this one than *Egan*. In *Franceschi*, much like the present case, the insurer refused to pay a claim because a genuine issue existed concerning interpretation of the contract terms and liability. Although the insurer's interpretation of the contract was incorrect, this court found as a matter of law that the insurer did not violate its duty of good faith. "[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, even if the court concludes the claim is payable under the policy terms, so long as there existed a genuine issue as the insurer's liability." *Id.* (citing *Safeco Ins. Co. of Am. v. Guyton*, 692 F.2d 551, 557 (9th Cir.1982) (applying California law)).

We think *Franceschi* provides the better approach to the case at bar. Once Hartford understood Pacific's interpretation of the contract and a genuine dispute over liability existed, Hartford was under no further duty to investigate Brinderson's claim on the bond. As Brinderson concedes, Hartford had every right to await the outcome of the liability dispute before paying on the performance bond.

At bottom, Brinderson believes Hartford investigated the claim in bad faith because Hartford was willing to adopt Pacific's interpretation of the contract. We agree that Pacific's and Hartford's interpretation of the contract is incorrect. As a matter of law, however, the interpretation is not so unreasonable as to be a mere pretext for avoiding further investigation; a genuine issue did exist concerning liability. Therefore, we affirm the district court's directed verdict on Brinderson's bad faith claim against Hartford.

## VI. Attorneys' Fees

Under the contract and Cal.Civ. Code section 1717, the prevailing parties on the contract and bond claims are entitled to recover attorneys' fees. Brinderson is therefore entitled to attorneys' fees incurred pursuing these contract claims, including fees incurred on appeal. Brinderson is also entitled to attorneys' fees incurred defending the fraud, misrepresentation, and other claims to the extent the fees were incurred litigating issues common to the contract claims. *See Reynolds Metals Co. v. Alperson*, 25 Cal.3d 124, 158 Cal. Rptr. 1, 599 P.2d 83, 86 (1979). However, Brinderson is not entitled to attorneys' fees incurred in pursuing its bad faith claim against Hartford because the issues in this tort action are not common to the contract action.

## CONCLUSION

For the reasons stated above, we affirm the district court's grant of summary judgment against Hartford's fraud and misrepresentation claims and the directed verdicts on Hartford's implied covenant claim and Brinderson's bad faith claim. We reverse the district court's denial of Brinderson's motion for a directed verdict on its contract claims and on Pacific's fraud and misrepresentation claims. This case is remanded for further proceedings consistent with this opinion. Except as otherwise ordered herein, each party will bear its own costs.

AFFIRMED in part and REVERSED in part.