**Ruby SIMKINS; M&K Enterprises,**
**Plaintiffs–Appellants,**

v.

**NEVADACARE, INC., Defendant–**
**Appellee.**

No. 99–16844.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 14, 2000

Filed Oct. 3, 2000

As Amended Oct. 31, 2000.

Edgar Carranza, Backus & Delikanakis, Las Vegas, Nevada, for the plaintiffs-appellants.

Constance L. Akridge, Wadhams & Akridge, P.C., Las Vegas, Nevada, for the defendant-appellee.

Before: SCHROEDER, HAWKINS and FISHER, Circuit Judges.

FISHER, Circuit Judge:

In this appeal, we must determine what forms of treatment a woman recovering from breast cancer would have understood her health insurance plan to cover if her cancer reappeared—specifically, whether it would cover high dose chemotherapy with peripheral stem cell rescue ("HDC/PSCR"). Does NevadaCare's Plan, which includes coverage for chemotherapy and blood transfusions, but which, under an exclusion for organ transplants, excludes most tissue transplants, cover HDC/PSCR?

The district court on summary judgment found that HDC/PSCR was a tissue transplant, clearly excluded from coverage. We hold that the district court erred in not interpreting the Plan's terms from the perspective of an average person. We further hold that a person of average intelligence and experience would interpret the terms of the Plan to include coverage for HDC/PSCR, and we therefore reverse and remand for further proceedings.

### Factual and Procedural Background

Simkins worked for M & K Enterprises ("M & K"), her husband's company. In October 1996, Simkins was diagnosed with Stage I breast cancer, which her doctors treated with radiation therapy. Although this treatment was initially successful, her doctors advised her that she would not be considered cured until she had been clear of the cancer for five years. In late 1997, M & K decided to change health care providers and considered contracting with NevadaCare. M & K ultimately decided to sign on with NevadaCare, and Simkins

enrolled as a participant/beneficiary of the Plan in January 1998.[1]

The Plan's Evidence of Coverage ("EOC") booklet describes the covered benefits. Included among the benefits covered are "[b]lood and blood plasma and their administration" and "chemotherapy." Also included are "services required for human tissue and organ transplants," but with a limitation: "Tissue transplant coverage is limited to allogenic bone marrow only."[2] Part VI of the EOC booklet is entitled "Exclusions, Limitations And Non–Covered Services." Two exclusions are relevant here. First, there is a catch-all exclusion, which excludes "[a]ny services or supplies not specifically listed in this Evidence of Coverage as covered benefits, services, or supplies." Second, there is a specific exclusion which states:

> We will cover services for covered organ transplant expenses, as defined below, incurred by a Member for an organ transplant approved by Us at a facility approved by Us, subject to those conditions and limitations described below.... We will cover only services, care and treatment received for or in connection with the approved transplantation of the following human organs:
>
> 1. Heart, Kidney, Cornea, and Liver. Liver transplant limited to that required as a result of biliary atresia only.
> 2. Tissue transplant coverage is limited to allogenic bone marrow only.

Shortly after enrolling in the Plan, Simkins was diagnosed with Stage IV breast cancer, with at least 12 nodules in her lungs and a plum-sized mass on her liver. She was referred to the UCLA Medical Center for treatment, where her doctor recommended that she undergo HDC/PSCR.

According to the research study consent form Simkins signed at UCLA, stem cells are the immature cells in the bone marrow that mature to produce the different kinds of blood cells (red and white blood cells and platelets) that circulate in the blood stream. Although stem cells are found mainly in the bone marrow, there are always some of them circulating in the blood. The patient is given an injection of drugs to stimulate stem cell reproduction and mobilization out of the bone marrow and into the circulating blood. Then, through a series of transfusions, blood is removed from the patient's body and, after passing through a machine that filters out the stem cells, is returned to the body. This "harvesting" procedure may be performed multiple times to collect enough stem cells. During the next phase of the procedure, the patient is given extremely high doses of chemotherapy (HDC) to try to kill off all of the cancer cells, a process that also kills off many of the patient's healthy cells. To help the patient recover more rapidly from the HDC, she is given a transfusion of the previously collected stem cells, which will migrate through the bloodstream into the bone marrow with the hope they will take hold, grow and produce mature red and white blood cells and platelets.

On April 3, 1998, the UCLA Medical Center wrote on Simkins' behalf to NevadaCare requesting coverage for the HDC/PSCR procedure. The request described the procedure as "high dose chemotherapy with autologous peripheral blood stem cell +/bone marrow support."[3] NevadaCare

---

1. Simkins was clearly cognizant that a change of insurance plans might affect her ability to get the necessary monitoring or obtain necessary treatment should a relapse occur. She discussed the scope of NevadaCare's coverage with M & K's personnel manager, who found no evidence that the Plan would limit Simkins' available treatment options.

2. An allogenic bone marrow transplant involves a patient receiving bone marrow from a separate donor. This can be contrasted with an autologous transplant, in which the patient is both the donor and the recipient of the transplanted cells.

3. Presumably, if doctors were unable to harvest a sufficient number of stem cells from the blood, they would have had to collect them

responded with a denial of coverage letter on April 30, 1998, which stated:

> The requested services for a[sic] autologous bone marrow transplant for Ruby Simkins has been reviewed and denied as a noncovered benefit. The Nevada-Care evidence of coverage (EOC), which you received at the time of enrollment outlines the benefits of transplant services and specifically states that tissue transplant coverage is limited to allogenic bone marrow only. This denial of benefits is a denial of plan coverage and is not related to the medical necessity, per the diagnosis.

Simkins' doctor responded to the denial of benefits on May 11, 1998. In his letter, perhaps misunderstanding NevadaCare's reason for denying coverage, the doctor explained the procedure, emphasizing it was "not an experimental technique."

Because HDC/PSCR offered her the best chances for survival, Simkins secured the funds necessary to pay for the treatment without insurance money. She received the treatment beginning on June 22, 1998, and it appears so far to have been successful, although she still requires follow-up procedures and monitoring.

Simkins sued NevadaCare for the denial of benefits. She filed motions for a permanent injunction and for partial summary judgment on the issue of whether the Plan covers HDC/PSCR. NevadaCare, in turn, filed its own motion for summary judgment, arguing that the Plan excluded the requested procedure. The district court denied Simkins' motions and granted NevadaCare's motion. Simkins appealed.

### Standard of Review

A grant of summary judgment is reviewed *de novo*. *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, an appellate court must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. *See id.*

■ Because the Plan is an employee welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, we review *de novo* "the district court's choice and application of the standard of review applicable to decisions by fiduciaries in the ERISA context." *Lang v. Long–Term Disability Plan*, 125 F.3d 794, 797 (9th Cir.1997). Courts review *de novo* a denial of benefits under an ERISA plan " 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' " *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.) (en banc) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). The burden is on the administrator to show that the plan gives it such discretionary authority. *See id.* The plan's reservation of discretion must be unambiguous to overcome the presumption of *de novo* review. *See McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1107 (9th Cir.2000) (citing *Kearney*, 175 F.3d at 1088–89).

NevadaCare contends the Plan gives it discretionary authority, so the abuse of discretion standard should apply. The district court appeared to agree with Nevada-Care, but found that, even under a *de novo* standard, NevadaCare's denial of benefits would have been proper.

■ NevadaCare points to three places in the Plan that it alleges give it the necessary discretion. None is sufficient. The first two are found in the "Definitions" section of the plan. First, "Medically Nec-

---

directly from the bone marrow. In Simkins' case, however, no bone marrow support was necessary. That the request for coverage let-

ter was sent before the procedure was performed might explain the phrase " +/bone marrow support."

essary" is defined as: "The use of services and/or supplies, as described in this Evidence of Coverage, which are required to identify or treat Your illness or injury and which are ... consistent with medical policy and procedure as defined by the NevadaCare Quality Management Program." NevadaCare's discretion to define medical policy and procedure is not the same as discretion to construe the terms of the Plan. Moreover, medical necessity was not an issue in this case, so the court is not reviewing NevadaCare's exercise of discretion in defining medical policy and procedure.[4]

■ Second, under the definition for "Prior/Pre–Authorization," the Plan states, "[A] Participating Provider or Physician must receive approval from an authorized staff member of NevadaCare, such as the Medical Director or his designee, before You receive certain health care services." Nothing in this definition unambiguously gives NevadaCare discretion to construe the terms of the Plan; it merely notes that a beneficiary may have to receive prior approval before receiving certain benefits.

■ Lastly, Part XI of the Plan, entitled "Member Rights and Responsibilities," describes the "Complaint and Grievance Procedure":

You have the right to express Your concerns and problems regarding Your NevadaCare coverage and benefits. You are encouraged to contact Member Services with any questions or problems as soon as they arise. NevadaCare is committed to providing prompt and responsive service to all Members.

If you are unhappy with the answer You receive, You can tell the Member Services Representative You wish to file a grievance....

NevadaCare will make a final decision for [sic] grievance about medical care services within fifteen (15) days of re-

ceiving written or oral grievance. A letter will be mailed to You stating NevadaCare's decision and the reason for the decision. The letter will tell You how You can appeal the decision if You are not satisfied. You must let NevadaCare know if You want to appeal the decision.

Again, nothing in this description of the grievance procedure unambiguously gives NevadaCare discretion to construe the terms of the Plan.

Comparing the above three statements to the statements in plans we have found to have granted discretion unambiguously to plan administrators, we find a stark contrast. The plan in *McDaniel,* for example, provided that "the Plan Administrator has the 'sole discretion to interpret the terms of the Plan' and those interpretations 'shall be conclusive and binding.'." 203 F.3d at 1107. The plan in *Bendixen v. Standard Insurance Co.* stated, "we have full and exclusive authority ... to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." 185 F.3d 939, 943 n. 1 (9th Cir. 1999). The plan in *Atwood v. Newmont Gold Co.* specified that the administrator "shall be the sole and exclusive judge as to whether or not a termination is qualified for benefits under the terms of this Plan." 45 F.3d 1317, 1321 (9th Cir.1995). Because the Plan's language in the present case does not unambiguously grant NevadaCare discretion to interpret the terms of the Plan, we review *de novo* NevadaCare's denial of benefits.

### Discussion

■ We turn now to the proper interpretation of NevadaCare's Plan and whether it covers or excludes HDC/PSCR. Terms in ERISA insurance policies are to be interpreted "in an ordinary and popular sense as would a [person] of average intel-

---

**4.** The denial of coverage letter from NevadaCare stated that the denial of benefits in this case was "a denial of plan coverage and [was]

*not related to the medical necessity,* per the diagnosis." (Emphasis added.)

ligence and experience." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir.1990) (internal quotation marks omitted) (alteration in original). "[A]mbiguous language is construed against the insurer and in favor of the insured." *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1134 (9th Cir.1996). However, we should "not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Evans*, 916 F.2d at 1441 (internal quotation marks and citation omitted).

Simkins argued before the district court that the Plan's exclusions were ambiguous and confusing and that a reasonable beneficiary would not read the Plan as excluding HDC/PSCR. Specifically, the exclusion, "Tissue transplant coverage is limited to allogenic bone marrow only," is found within a section that begins "We will cover services for covered organ transplant expenses, as defined below...." In her motion papers, Simkins emphasized the difference between allogenic bone marrow transplants and HDC/PSCR, and argued she was "not requesting an *organ transplant* but rather a transfusion of her stem cells." *Plaintiff's Motion for Permanent Injunction*, at 16 (emphasis in original).

The district court granted NevadaCare's summary judgment motion, noting that "[r]egardless of whether these are two different procedures, the undisputed evidence shows that they are both tissue transplants." The court then concluded that, because the plain, unambiguous language of the Plan limits tissue transplants to allogenic bone marrow transplants, which HDC/PSCR is not, the denial of benefits was proper.

■ We hold that the district court should have considered whether a person

of average intelligence and experience would construe the term "tissue transplant" to encompass HDC/PSCR. We believe the average person would not understand the term "tissue transplant" to encompass HDC/PSCR, because she would not understand stem cells to be "tissue." Instead, the average person would focus on the fact that stem cells in this procedure are a component of the patient's blood. Indeed, the research study consent form Simkins signed specifically mentions that the stem cells would be collected from her blood stream. The average person is not likely to understand blood to be tissue, especially when the Plan specifically discusses blood transfusions separately from tissue transplants and places tissue transplant coverage within the *organ* transplant section, a locational choice that has a distinct potential of misleading and confusing average plan participants.[5] Because stem cells would not be understood to be tissue, the average person would have no reason to believe the tissue transplant exclusion extended to HDC/PSCR. Accordingly, it was improper for the district court to grant summary judgment in favor of NevadaCare on this ground.

■ NevadaCare also argued, and the district court agreed, that even if the procedure is not excluded by the tissue transplant exclusion, it is excluded by the catchall exclusion, encompassing "[a]ny services or supplies not specifically listed in this Evidence of Coverage as covered benefits, services, or supplies." Our determination of this contention turns on how an average person would interpret the Plan's "Services and Benefits" section, and whether the specific listed benefits in this section can reasonably be interpreted to include HDC/PSCR.

---

**5.** This understanding would be consistent with the dictionary definitions of "tissue" and "stem cell." Under "tissue," the dictionary states, "There are four basic types of tissue: muscle, nerve, epidermal, and connective."

The American Heritage Dictionary of the English Language 1880 (3d ed.1996). "Stem cell" is defined as "[a]n unspecified cell that gives rise to a specific, specialized cell, such as a blood cell." *Id.* at 1761.

We believe it is reasonable for the average person to read the Plan's benefits section as providing coverage for HDC/PSCR. As noted above, HDC/PSCR is a multistep procedure involving filtering stem cells from the patient's blood, giving the patient high doses of chemotherapy and reinfusing the filtered stem cells back into the bloodstream. The research study overview that Simkins signed described the reinfusion of stem cells to be "like a transfusion." The Plan specifically covers blood and its administration and chemotherapy. Neither blood nor chemotherapy is defined. An average person would reasonably interpret coverage for "blood" to extend to the specific components of blood, including the stem cells involved here. An average person would also reasonably conclude that the general term "chemotherapy" covers all levels of chemotherapy used in treatment. If both steps of HDC/PSCR are covered separately, the average person would find it highly unlikely that they would not be covered when performed together.[6] Therefore, a reasonable interpretation of the Plan supports the conclusion that HDC/PSCR is specifically covered, and thus not excluded by the catch-all exclusion.

As we have noted previously, "the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence." *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir.1990). Ruby Simkins knew there was a risk her cancer would return, and she made an effort to ensure that her transfer to a NevadaCare insurance plan would not limit her potential treatment options in the event of such an unfortunate recurrence. If NevadaCare wishes to exclude coverage of a procedure such as HDC/PSCR from its insurance plans, it should do so conspicuously and unambiguously so a reasonable insured can determine this fact by looking at her policy. Its subsequent reliance on an exclusion for "tissue transplants"—and worse, a "catch-all" exclusion—to exclude coverage for HDC/PSCR is not at all compelling.

NevadaCare argues that Simkins waived her argument that the Plan's coverage for chemotherapy and blood transfusions translates into coverage for HDC/PSCR by not raising it before the district court. *See Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1186 n. 4 (9th Cir.1997) (noting that an argument generally must be raised in the district court before it will be considered on appeal). NevadaCare reads the waiver rule too broadly. Although Simkins' specific interpretation of the Plan was not expressly raised below, we consider the record sufficient to justify consideration of her more general argument that the Plan is ambiguous and can reasonably be read to include coverage for HDC/PSCR. Accordingly, the general issue is properly before us on appeal, and we are not precluded from considering any reasonable interpretation of the Plan.

Because the Plan can reasonably be read to cover HDC/PSCR, the district court improperly granted summary judgment to NevadaCare. The only remaining question, then, is whether the district court properly denied Simkins' motion for partial summary judgment, which sought a

---

**6.** Relying on *Hendricks v. Central Reserve Life Insurance Co.*, 39 F.3d 507 (4th Cir.1994), NevadaCare argues that it is improper to fragment HDC/PSCR into its component parts for the purpose of determining whether the Plan covers the procedure. The insurer in *Hendricks* denied coverage for HDC/PSCR under an exclusion for "experimental/investigative" procedures. *See* 39 F.3d at 509. Although we do not comment on the wisdom of prohib- iting fragmentation in that context, its use here is clearly distinguishable. We are determining whether an average person reasonably would interpret the Plan as covering HDC/PSCR. An average person trying to assess whether an insurance plan covered a complex procedure reasonably would look to whether the component parts are covered to make that determination.

determination that the Plan covered HDC/PSCR. As we have held, there exists a reasonable interpretation of the Plan that covers HDC/PSCR. Because "ambiguous language is construed against the insurer and in favor of the insured," *McClure*, 84 F.3d at 1134, the existence of such a reasonable interpretation means that, even if contrary reasonable interpretations exist, a jury would be required to adopt the one that favors coverage for the insured. Accordingly, there is no genuine issue for trial on this question, and the district court should have granted Simkins' motion for partial summary judgment.

REVERSED and REMANDED for further proceedings consistent with this opinion.