**Richard PECAROVICH,**
**Plaintiff–Appellant,**

v.

**ALLSTATE INSURANCE COMPANY,**
**Defendant–Appellee.**

**No. 00–55400.**

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 7, 2001.*

Filed Oct. 31, 2002.

---

* The panel unanimously finds this case suitable for submission without oral argument pursuant to Fed. R.App. P. 34(a)(2).

Robert S. Gerstein, Santa Monica, CA, Paul S. Sigelman, Beverly Hills, California, for the plaintiff-appellant.

Peter H. Klee, Seth M. Friedman, Luce, Forward, Hamilton & Scripps, San Diego, CA, for the defendant-appellee.

Before BROWNING, REINHARDT, and TALLMAN, Circuit Judges.

Opinion by Judge BROWNING; Dissent by Judge TALLMAN.

## OPINION

BROWNING, Circuit Judge.

Richard Pecarovich's home suffered major damage after an El Nino rainstorm struck Southern California in 1998. He brought suit to collect under his Standard Flood Insurance Policy with Allstate, a private insurer under the National Flood Insurance Program. The district court granted summary judgment for Allstate on the ground that the damage was not caused by a covered "flood." We reverse.

## I.

Pecarovich's home sits at the base of a canyon in Laguna Beach, California. After he saw Allstate television advertisements warning of anticipated El Nino storms, Pecarovich purchased a flood insurance policy from Allstate under the National Flood Insurance Program.

On February 24–25, 1998, a torrential rainstorm struck the Laguna Beach area. Rain ran down the hill behind Pecarovich's home, gushed out of a drainage collection system, flowed around his house and pooled in his backyard patio.

The concrete slab under his home developed major breaks and pulled away from a wall, rendering the home uninhabitable. Pecarovich reported the damage to Allstate and Allstate assigned an independent claims adjuster, Richard Rossi, to investigate. An official with the National Flood Insurance Program initially stated that the damage was not covered, but agreed to reconsider if Rossi provided certain engineering reports and cost estimates. Allstate retained several engineers to prepare the reports but failed to pay them; the engineers refused to complete the reports and without them Rossi could not and did not complete his adjuster's report.

Pecarovich filed a complaint in district court in February of 1999 seeking to recover under the policy. The district court granted summary judgment for the defendant on the ground that plaintiff's home was not damaged by a "flood" covered by the policy.[1] Pecarovich appeals.

## II.

■ Viewing the evidence in the light most favorable to Pecarovich, a portion of his backyard was flooded when storm water ran down the hills behind his home and submerged a portion of his back yard. Allstate argues the damage falls within one of two exclusions under the policy: (1) the flood was confined to Pecarovich's premises, or (2) the damage was caused by "movement of land." We construe any ambiguity in these exclusions strictly against Allstate and in favor of coverage. *See Linder & Assocs. v. Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir.1999); *see also Simkins v. NevadaCare, Inc.*, 229 F.3d 729, 735–37 (9th Cir.2000).

### A.

■ Article 3(C)(2) of the policy creates an exclusion for "A loss from a flood which is confined to the premises on which your insured property is located unless the flood is displaced over two acres of property." In holding the exclusion applicable, the district court failed to give weight to the declaration of Peter Savage, whose property lies adjacent to and above Pecarovich's property. Savage declared that during the storm an "enormous" amount of water ran off the hills into Savage's backyard, flowed across his property and damaged a retaining wall.[2] Savage, like Pecarovich, experienced flood conditions on his property.

1. Pecarovich's policy defines a "flood" as:

   A. A general and temporary condition of partial or complete inundation of normally dry land area from:
   1. The overflow of inland or tidal waters.
   2. The unusual and rapid accumulation or runoff of surface waters from any source.

   3. Mudslides (i.e., mudflows) which are proximately caused by flooding as defined in subparagraph A–2 above and are akin to a river of liquid and flowing mud on the surfaces of normally dry land areas, including your premises, as when earth is carried by a current of water and deposited along the path of the current.

2. Pecarovich submitted this declaration through an improper "sur-opposition" brief

Allstate argues that even if Savage's property was inundated, it was the result of a separate "flood" because there is no evidence that both properties were submerged under one continuous pool of water. While Article 3(C)(2) does exclude a flood that is confined to the insured's premises, it also incorporates the general definition of "flood" in Article 2: a "general and temporary *condition* of partial or complete inundation." (Emphasis added). The fact that storm water from the same source flowed down the canyon along two separate paths—one that inundated Pecarovich's property, and another that inundated Savage's property—does not preclude a reasonable finding that both Savage and Pecarovich suffered from the same "condition of inundation."

### B.

■ Allstate seeks to apply a second exclusion, barring recovery for damage caused by "movement of land." Pecarovich argues, however, that the damage was

caused by "land subsidence" which *is* covered by the policy.[3]

FEMA amended Article 3(B)(3) in 1994 to extend limited coverage for land subsidence. *See* 58 F.R. 62420, 62421 (November 26, 1993) (noting that the amendment provides "that the policy *does cover* loss caused by land subsidence, sewer backup or seepage of water where the enumerated conditions are present") (emphasis added); *see also Smoak v. Indep. Fire Ins. Co.*, 180 F.3d 172, 173–75 (4th Cir.1999). Allstate argues that even if the loss is covered as land subsidence under Article 3(B)(3), it falls within the exclusion for land movement under Article 3(B)(1). However, since any type of "land subsidence" would also be "land movement," this interpretation would render the expanded coverage for land subsidence meaningless. As FEMA plainly intended to expand coverage to include land subsidence when the enumerated conditions are met, the land movement exclusion cannot bar coverage if the loss also falls within the coverage for land subsidence.[4]

---

in violation of local rules. Despite the impropriety of the submission, the district court stated in its order granting summary judgment that it had reviewed this evidence and found, erroneously, that the evidence failed to raise a material fact. It would be improper for us to ignore this evidence of flood conditions and affirm summary judgment effectively as a sanction for violating a local rule when the district court did not itself consider such a sanction to be appropriate. *See Marshall v. Gates*, 44 F.3d 722, 725 (9th Cir.1995).

**3.** According to Article 3(B) of the policy, Allstate will not cover losses caused by:

> 1. Theft, fire, windstorm, wind, explosion, earthquake, land sinkage, landslide, *destabilization or movement of land* resulting from the accumulation of water in subsurface land areas, gradual erosion, or any other earth movement except such mudslides (i.e., mudflows) or erosion as is covered under the peril of flood.
>
> \* \* \*

> 3. *Land subsidence*, sewer backup, or seepage of water *unless*, subject to additional deductibles as provided for at Article 7, (a) there is a general and temporary condition of flooding in the area, (b) the flooding is the proximate cause of the land subsidence, sewer backup, or seepage of water, (c) the land subsidence, sewer backup, or seepage of water damage occurs no later than 72 hours after the flood has receded, and (d) the insured building must be insured, at the time of the loss, for at least 80 percent of its replacement cost or the maximum amount of insurance available under the National Flood Insurance Program.

(Emphasis added).

**4.** Allstate further argues that there is insufficient evidence that the land subsidence exceptions apply. Although Allstate's experts contend that the flooding was not the proximate cause of the subsidence, the report of Pecaro-

## III.

Alternatively, Allstate argues that summary judgment should be affirmed because Pecarovich did not comply with the policy's procedural requirements for submitting a claim. To collect under the Standard Flood Insurance Policy, a claimant ordinarily must submit a "proof of loss" within sixty days after the loss. The proof of loss must include numerous details, including specific estimates of the damage, that might be difficult to obtain within the sixty-day limit.[5] To alleviate this burden on claimants, another section of the policy—Article 9(J)(7)—creates an alternative, streamlined procedure for submitting a claim:

> We may, at our option, waive the requirement for the completion and filing of a proof of loss in certain cases, in which event you will be required to sign and, at our option, swear to an adjuster's report of the loss which includes information about your loss and the damages sustained, which is needed by us in order to adjust your claim.

Pecarovich argues that Allstate released him from the proof of loss requirement and permitted him to submit an adjuster's report under Article 9(J)(7).

### A.

■ Allstate contends only FEMA had the authority to grant an exception from the proof of loss requirement, interpreting the phrase "we" in Article 9(J)(7) as meaning "FEMA," not "Allstate."

The preamble of Pecarovich's policy states that "we" refers to FEMA:

> **AGREEMENT OF INSURANCE** between the Federal Emergency Management Agency (FEMA), as Insurer, (hereinafter known as "we," "our," and "us") and the Insured, (hereinafter known as "you" and "your").

The preamble, however, is factually incorrect. Under the federal Write Your Own ("WYO") program, insurance policies may be offered and administered by private insurers with the federal government acting as an underwriter. *See Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 389 (9th Cir.2000) ("The WYO program allows

---

vich's expert is sufficient to create a material issue for trial.

**5.** Under article 9(J)(3) of Pecarovich's policy, he was required to do the following:

> 3. Within 60 days after the loss, send us a proof of loss, which is your statement as to the amount you are claiming under the policy signed and sworn to by you and furnishing us with the following information:
>
> a. The date and time of the loss;
> b. A brief explanation of how the loss happened;
> c. Your interest in the property damaged (for example, "owner") and the interest, if any, of others in the damaged property;
> d. The actual cash value or replacement cost, whichever is appropriate, of each damaged item of insured property and the amount of damages sustained;

> e. Names of mortgagees or anyone else having a lien, charge or claim against the insured property;
> f. Details as to any other contracts of insurance covering the property, whether valid or not;
> g. Details of any changes in ownership, use, occupancy, location or possession of the insured property since the policy was issued;
> h. Details as to who occupied any occupied any[sic] insured building at the time of loss and for what purpose; and
> i. The amount you claim is due under this policy to cover the loss, including statements concerning:
>    (1) The limits of coverage stated in the policy; and
>    (2) The cost to repair of replace [sic] the damaged property (whichever costs less).

(Emphasis omitted). *See also* 44 C.F.R. pt. 61, App. A(1) (2002) (specifying the terms of the Standard Flood Insurance Policy).

private insurers to write standard flood insurance policies under their own names.") Accordingly, Pecarovich's policy was titled an "Allstate Dwelling Policy" on its cover sheet and the policy was endorsed by two Allstate executives on behalf of Allstate. The policy appears to be a contract between Pecarovich and Allstate, not Pecarovich and FEMA.

Allstate made the policy ambiguous by failing to substitute its own name wherever "FEMA" appeared in its contract with Pecarovich. *See* 44 C.F.R. § 61.13(f) (2002) (In the case of any Standard Flood Insurance Policy, and its related forms, issued by a WYO Company, wherever the names "Federal Emergency Management Agency" and "Federal Insurance Administration" appear, the WYO Company is authorized to substitute its own name therefor.") [6] In this context, the phrase "we" in the policy identifies Allstate, not FEMA.[7] *See Battle v. Seibels Bruce Ins. Co.,* 288 F.3d 596, 600 n. 2 (4th Cir.2002) (interpreting the phrase "we" in Article 9(R) as referring to the private insurer). So read, Article 9(J)(7) in the contract between Allstate and Pecarovich provides:

> We [Allstate] may, at our [Allstate's] option, waive the requirement for the completion and filing of a proof of loss in certain cases, in which event you will be required to sign and, at our option,

swear to an adjuster's report of the loss which includes information about your loss and the damages sustained, which is needed by us in order to adjust your claim.

*See Gowland v. Aetna,* 143 F.3d 951, 954 (5th Cir.1998) (the Standard Flood Insurance policy provides "that the *insurer,* at its option, may waive the proof of loss requirement in certain cases") (emphasis added).[8] This interpretation is consistent with the purpose of the "Write Your Own" program: to give private insurers the authority to adjust flood claims efficiently, in keeping with general business standards. *See* 44 C.F.R. § 62.23(d), (i) (2002).

Allstate argues that this interpretation conflicts with our decision in *Flick.* The plaintiff in *Flick* argued that despite her failure—by several months—to submit a timely proof of loss, she was entitled to recover under a Standard Flood Insurance Policy because she had substantially complied with the policy. We rejected the "substantial compliance" standard:

> Because flood losses, whether insured by FEMA or by a participating WYO insurer, are paid out of the National Flood Insurance Fund, a claimant under a standard flood insurance policy must comply strictly with the terms and conditions that Congress has established for

**6.** While the most current Code of Federal Regulations is cited, provisions pertain to the time of the contract between Allstate and Pecarovich unless otherwise stated.

**7.** FEMA later amended the terms of the Standard Flood Insurance Policy to expressly define "we," "us" and "our" as referring to the private insurer, not FEMA. *See* 65 F.R. 60758, 60778 (2000). This change was intended to clarify the previous version of the policy through "plain language" revisions, not to create a substantive change. *See id.* at 60758.

**8.** In *Gowland,* 143 F.3d at 954, the Fifth Circuit held that the insured had not complied

with Article 9(J)(7) because the insured never actually submitted the adjuster's report. Under Article 9(J)(7), an insured must sign, and, if asked, swear to an adjuster's report as a condition precedent to recovery. Pecarovich failed to do so, but has raised a genuine issue for trial that he is excused from this requirement because Allstate failed to provide him with an adjuster's report to sign. *See Moore Bros. Co. v. Brown & Root, Inc.,* 207 F.3d 717, 725 (4th Cir.2000) ("The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused.")

payment. That is the simple, but powerful command of the Appropriations Clause. Congress, through a valid act of delegation to FEMA, has authorized payment of flood insurance funds to only those claimants that submit a timely sworn proof of loss. We therefore have no more power to award a money remedy to a flood insurance claimant who submits a sworn proof of loss after the 60 day time limit than we have to award a money remedy to a disability benefits claimant whose income exceeds a statutory earnings limit.

205 F.3d at 394–95 (citations and footnotes omitted). Because the policy did not allow this extension, we declined to create an exception.

Pecarovich, however, is not seeking to avoid strict compliance with the policy. He argues that he received valid permission under the terms of Article 9(J)(7) of the policy to use this alternative procedure for submitting his claim. Pecarovich is not seeking to avoid the conditions Congress has established for payment; the only dispute here is one of contract interpretation—whether under the terms of Article 9(J)(7), he was required to obtain the necessary permission from FEMA or from Allstate.[9] Correctly interpreted, Article 9(J)(7) gave Allstate the discretion to approve this procedure.

Allstate's ability to approve the alternative procedure in Article 9(J)(7) is not af-

fected by Article 9(D), which provides that the policy "cannot be amended nor can any of its provisions be waived without the express written consent of the Federal Insurance Administrator." *See also* 44 C.F.R. § 61.13(d) (2002) (stating that "no provision of the [Standard Flood Insurance Policy] shall be altered, varied, or waived other than by the express written consent of the Administrator through the issuance of an appropriate amendatory endorsement"); *Flick*, 205 F.3d at 391(recognizing that the private insurer could not unilaterally extend the 60–day time limit for submitting a proof of loss because doing so would have constituted an unauthorized waiver of the policy's plain language). As we have said, Pecarovich was not seeking to amend or waive the terms of his policy, but only to follow an alternative procedure for submitting a claim in accordance with the policy.[10]

## B.

■ Finally, Allstate argues that even if it had the ability to approve the procedure in Article 9(J)(7), there is insufficient evidence that it gave Pecarovich permission to do so. According to Pecarovich, an Allstate supervisor met with him one month after the loss, told him that Allstate would "take care of everything", and that he was in good hands.

---

**9.** Indeed, we noted in a dictum in *Flick* that Article 9(J)(7) permits a departure from the default proof of loss requirement. *See id.* at 396 ("Our holding does not suggest that claimants must always strictly comply with the 60 day sworn proof of loss requirement.") Although we assumed that only FEMA could grant this exception, the issue was not before us because the plaintiff did not claim to rely on Article 9(J)(7). *See id.* at 396 n. 15.

**10.** Even if the general language of Article 9(D) could be interpreted as requiring

FEMA's approval under Article 9(J)(7), the specific language of Article 9(J)(7) gives Allstate the discretion to approve this procedure. *See Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992) ("It is well settled that'[w]here there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.' ") (quoting Restatement of Contracts § 236(c) (1932)).

After Allstate appointed Rossi to adjust the claim, Rossi told Pecarovich that Pecarovich should follow his instructions about how to submit the claim. Rossi explained that after he obtained an estimate of the damage, he would meet with Pecarovich, specify the amount of the loss in an adjuster's report, and require Pecarovich to sign the report. Pecarovich asked if he needed to submit anything else, and Rossi said "no." However, Rossi never completed the report.[11]

This evidence is sufficient to create an inference that Rossi, with Allstate's authority, agreed to accept a signed adjuster's report in lieu of a proof of loss. *See Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ("[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in[that party's] favor.' ") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Allstate appointed an adjuster, but the adjuster did not provide a report to Pecarovich for him to sign. Pecarovich was not obligated to sign or swear to a report he did not receive. Moreover, Allstate continued to process Pecarovich's claim for nearly a year, despite his failure to submit a timely proof of loss, and did not request a proof of loss until March of 1998—after it was far too late for Pecarovich to comply. Pecarovich has raised a genuine issue of fact as to whether he properly submitted his claim.

**IV.**

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND.

TALLMAN, Circuit Judge, dissenting:

Because I believe Pecarovich's claim is procedurally barred under well settled law, I respectfully dissent.

A claimant must strictly comply with the terms of the Standard Flood Insurance Policy ("SFIP").[1] *Flick v. Liberty Mutual*, 205 F.3d 386, 387 (9th Cir.2000) (concluding "that the strict compliance rule is applicable to policies written by private insurance companies under the National Flood Insurance Program"); *Wagner v. FEMA*, 847 F.2d 515, 518 (9th Cir.1988) ("The SFIP's procedural requirements must be taken seriously: They constitute conditions precedent to a waiver by the federal government of its sovereign immunity."). *See also Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (recognizing the "duty of all courts to observe the conditions defined by Congress for charging the public treasury"). Thus, when seeking to avoid the procedural hurdles imposed by the SFIP, the claimant faces a "heavy burden." *Flick*, 205 F.3d at 390.

Pecarovich did not meet the SFIP procedural requirements. He did not file a proof of loss within 60 days of the alleged flood as required by the SFIP; in fact, he

11. We reject Allstate's contention that Pecarovich's declaration was a sham affidavit that contradicted his earlier deposition testimony. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–807, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995). In his deposition, Pecarovich testified that Allstate never told him whether it had made a final decision to approve his claim. That is distinct from his declaration testimony:

whether Allstate had consented to the alternative procedure for submitting a claim.

1. The SFIP contract signed by Pecarovich also requires strict compliance with all procedural terms. Article 9(R) ("You may not sue us to recover money under this policy unless you have complied with all the requirements of the policy.").

never filed a proof of loss. Consequently, his only avenue of recovery was under Article 9(J)(7) of the policy,[2] which provides for a waiver of "a proof of loss in certain cases, in which event[the insured] will be required to sign and, at [Allstate's] option, swear to an adjuster's report . . . ." Strict compliance with Article 9(J)(7) required that, at a minimum, (1) Allstate expressly waive the requirement that Pecarovich file a proof of loss, and (2) Pecarovich sign the adjuster's report. *Gowland v. Aetna*, 143 F.3d 951, 954 (5th Cir.1998). Neither of these conditions precedent to a proper SFIP claim were satisfied by Pecarovich.

In an understandable desire to help Mr. Pecarovich get some compensation for his loss, the Court's opinion is premised upon the incorrect assumption that Allstate waived the requirement that he file a proof of loss, though Pecarovich himself admits that Allstate never expressly waived that requirement.[3] Nonetheless, the Court holds that Allstate's assurances to Pecarovich (that Allstate would satisfy the claim) somehow waived the proof of loss requirement.

When the uncontested evidence is fairly viewed, however, Allstate's alleged statements neither create an express waiver to the proof of loss requirement nor give rise to an inference of waiver. Pecarovich's

**2.** This is assuming that the "We" in Art. 9(J)(7) means "Allstate" as the majority contends. If "We" means "FEMA," then Pecarovich's claim is necessarily precluded without further analysis because FEMA never waived the proof of loss requirement.

**3.** In Allstate's deposition of Pecarovich, the following colloquy occurred:

> Q Were you ever advised by Mr. Rossi or any Allstate representative as to what coverage decision had been made on your claim?
> A No.

own declaration, upon which the majority relies, provides, in relevant part:

> I believe around mid-March and within a month of the loss, Mr. Rossi returned with a supervisor from Allstate. She told me that the reason she came out was to assure me that Allstate "would take care of everything" and that I was in good hands.
>
> Either at that same time, or a few days later, in March Rossi told me he was having a problem with someone he had spoken to about the claim. He said, we "can't proceed with adjustment of the claim unless I (Mr. Rossi) can establish certain information about the loss." He then said he would therefore put together a report for me. He said that he would tell me what I had to do to be paid on the claim, and told me on no uncertain terms that he was calling the shots and I was just to take his direction. I asked him if there was anything else I needed to do, and he said no . . . .
>
> Rossi repeatedly said that "he was in charge" and I could do nothing without his approval. I don't recall his exact words, but by what he told me I understood that after he had the cost of repair he would meet with me, agree on the amount of loss, on the loss to be included in his report, and I would have to sign off on it.

> Q Were you ever advised at any point in time by Mr. Rossi or any Allstate representative that a decision had been made not to pay your claim?
> A No.
> Q Have you ever been advised by Mr. Rossi or any Allstate representative as to what coverage decision had been made to pay your claim?
> A No.
> ************
> Q Did Mr. Rossi ever tell you, "Don't fill out a proof of loss form"?
> A No.

Viewing this statement in the light most favorable to Pecarovich, Allstate never expressly waived the proof of loss requirement. The Allstate supervisor's statement to Pecarovich that Allstate "would take care of everything" is not a waiver of the SFIP procedural requirements; it is mere puffery. Similarly, Adjuster Rossi's assurances to Pecarovich never indicated that Allstate intended to waive the SFIP hurdles.

At most, Pecarovich can argue that (1) Allstate constructively waived the proof of loss requirement or (2) Allstate should be equitably estopped from denying a waiver. But, the case law has generally rejected such equitable theories of liability in the context of the SFIP since public monies are at stake. *See, e.g., Flick*, 205 F.3d at 394–95 (rejecting a substantial compliance standard in determining compliance with the SFIP procedural requirements); *Gowland*, 143 F.3d at 954–55 (dismissing theories of constructive waiver and equitable estoppel); *Wagner*, 847 F.2d at 519 (holding that equitable estoppel is narrowly defined in the context of the SFIP to include only "affirmative misconduct going beyond mere negligence").[4]

Assuming arguendo that Allstate somehow acted to waive the proof of loss requirement, Pecarovich still needed to sign an adjuster's report in order to strictly comply with Article 9(J)(7). *Gowland*, 143 F.3d at 954 (noting that the insured is required to sign an adjuster's report in order to effect a waiver of the proof of loss requirement); *Jamal v. Travelers Lloyds of Tex. Ins. Co.*, 131 F.Supp.2d 910, 918 (S.D.Tex.2001) (explaining that a signed adjuster's report is a condition for waiving the proof of loss requirement). *See also Mancini v. Redland Ins. Co.*, 248 F.3d 729, 734 (8th Cir.2001) (holding that claimants had not "signed" the proof of loss form by placing their names on a fax transmittal sheet). Viewing the evidence in the light most favorable to Pecarovich, this case is at best an example of substantial compliance with the SFIP provisions. But substantial compliance with the SFIP procedural requirement does not cure Pecarovich's failure to sign an adjuster's report. His claim is still precluded. *Flick*, 205 F.3d at 394–95 (holding that substantial compliance with the SFIP terms is insufficient; a claimant "must comply strictly with the terms and conditions that Congress has established for payment").

Pecarovich needed to file a proof of loss within 60 days of his loss in order to perfect his claim. He did not. There was no waiver of this requirement. Summary

---

4. Similarly, any other affirmative conduct taken by Allstate (i.e., pursuing the claim after the 60–day deadline to file a proof of loss had expired) did not waive SFIP conditions. *See, e.g., Phelps v. FEMA*, 785 F.2d 13, 19 (1st Cir.1986) (finding claimant's reliance on the assurances of the NFIP representative unreasonable); *Riverdale Mills Corp. v. American Modern Home Ins. Co.*, 122 F.Supp.2d 114, 118–120 (D.Mass.2000) (ruling that insurer's letter holding open an additional 30 days to file claim past the 60–day deadline for filing the proof of loss did not operate as a waiver of the deadline). Furthermore, the plain language of the SFIP should have put Pecarovich on notice that he was not entitled to rely upon the representations of Allstate in deciding whether or not to file a proof of loss. Article 9(J)(6) of the SFIP provides:

> The insurance adjuster whom we hire to investigate your claim may furnish you with a proof of loss form, and she or he may help you to complete it. However, *this is a matter of courtesy only, and you must still send us a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help you to complete it.*

(emphasis added). Thus, "the SFIP 'candidly warns' the insured not to rely upon the insurer for assistance in complying with the proof of loss requirement." *Riverdale Mills*, 122 F.Supp.2d at 118 (citing *Humphrey v. NFIP*, 885 F.Supp. 133, 137 (D.Md.1995) and *Wagner*, 847 F.2d at 520).

judgment in favor of Allstate was appropriate. Therefore, I respectfully dissent.